**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| JESSICA COOPER, DANIEL KUJAWA, PHILIP RINELLA, MELISSA RUMPF, and MATTHEW WILDER, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>ENDURANCE DEALER SERVICES, LLC, and ENDURANCE WARRANTY SERVICES, LLC,<br><br>Defendants. | Case No.: 1:25-cv-02919<br><br>**CLASS ACTION**<br><br><u>**JURY TRIAL DEMANDED**</u> |

<u>**CLASS ACTION COMPLAINT**</u>

Plaintiffs Jessica Cooper, Daniel Kujawa, Philip Rinella, Melissa Rumpf, and Matthew Wilder (collectively, "Plaintiffs"), individually, and on behalf of all others similarly situated, by and through their counsel, bring this action against Endurance Dealer Services, LLC and Endurance Warranty Services, LLC (collectively, "Defendants" or "Endurance"). Plaintiffs' allegations herein are based upon personal knowledge and belief as to their own acts, upon the investigation of counsel, and upon information and belief as to all other matters.

<u>**INTRODUCTION**</u>

1.      Plaintiffs bring this action on behalf of themselves and on behalf of a class of similarly situated consumers who purchased Vehicle Service Contracts from Defendants.

2.      Defendants primarily sell Vehicle Service Contracts (also referred to as Vehicle Protection Plans)[1] through their website: EnduranceWarranty.com.

---

[1] *See* Exhibits A-E.

3.      Despite their name, Defendants do not actually sell car warranties or extended warranties. Vehicle Service Contracts are auto service agreements in which "[t]he contract seller agrees to perform (or pay for) certain repairs or services outlined in the contract."[2] A Vehicle Service Contract is sold separately from the sale of a vehicle and a manufacturer's warranty, and often provides coverage beyond the manufacturer's warranty.

4.      Defendants tout themselves as America's "Best Vehicle Protection Plan Provider."[3] Defendants promise customers "complete coverage you can count on."[4] In particular, Defendants advertise that their protection plans are "the most comprehensive auto protection plans in the industry."[5]

5.      Defendants purport that their plans "are honored at any licensed repair facility anywhere in the nation. These facilities include dealerships, chain shops, or your local repair shop."[6] Endurance purportedly refers consumers to "expertly certified mechanics nationwide," to ensure that "covered warranty work gets done correctly the first time…customers get peace of mind by knowing that qualified technicians use industry-standard methods and quality parts."[7]

6.      Defendants further promise "peace of mind" with a "stress-free claims process" that takes as "little as 48 hours."[8]

---

[2] https://consumer.ftc.gov/articles/auto-warranties-and-auto-service-contracts#AutoServiceContractsFacts (last visited March 19, 2025).
[3] https://www.endurancewarranty.com/learning-center/press/endurance-honored-as-best-vehicle-protection-plan-provider-2024/ (last visited March 19, 2025).
[4] https://www.endurancewarranty.com/why-endurance/ (last visited March 19, 2025).
[5] *Id.*
[6] https://www.endurancewarranty.com/learning-center/company-resources/use-extended-warranty/ (last visited March 19, 2025).
[7] https://www.endurancewarranty.com/learning-center/company-resources/repairpal-network-for-qualified-mechanics/ (last visited March 19, 2025).
[8] https://www.endurancewarranty.com/why-endurance/ (last visited March 19, 2025).

7.     Defendants advertise and market to consumers full coverage for repair claims that are approved in minutes.[9] Indeed, on the front page of their website, Endurance promises that consumers will "never pay for covered car repairs again."[10]

# Never pay for covered car repairs again.

Endurance picks up where your auto warranty leaves off. When breakdowns happen, our vehicle protection plans shield you from the high cost of parts and labor.

8.     Defendants further boast that they have paid "over $300 million in paid claims. No out-of-pocket expense. Just a deductible (of $100)."[11]

9.     However, when consumers, including Plaintiffs, file claims for repairs under their respective Vehicle Service Contracts, Defendants do not deliver on their contractual obligations. Defendants take several weeks or months to render decisions on claims and have denied repair coverage without any contractual basis.

10.     As a result, consumers, including Plaintiffs, have incurred out-of-pocket expenses while waiting for Endurance to render decisions on their claims, lost complete use of their vehicles while waiting for a decision on their claims, have been forced to pay out of pocket for auto repairs

---

[9] *See* https://youtu.be/mSoAplDCxrA (last visited March 19, 2025).
[10] https://www.endurancewarranty.com/ (last visited March 19, 2025).
[11] *See* https://www.endurancewarranty.com/learning-center/company-resources/best-practices-for-filing-a-claim-with-endurance-warranty/ (last visited March 19, 2025).

that Endurance promised would be covered, and otherwise paid for a Vehicle Service Contract that does not provide the promised coverage that was the basis of the bargain.

11.     Accordingly, Plaintiffs, on behalf of themselves and all other consumers who purchased Vehicle Service Contracts from Endurance, bring this action for breach of contract, fraudulent concealment, fraudulent inducement, fraudulent misrepresentation, negligent misrepresentation, unjust enrichment, and for violations of Michigan's Consumer Protection Act, Mich. Comp. Laws §§ 445.901, *et seq.*, New Jersey's Consumer Fraud Act, N.J. Stat. Ann. §§ 56:8-1, *et seq.*, Ohio's Consumer Sales Practices Act, Ohio Rev. Code Ann. §§ 1345.01, *et seq.*, Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 73 P.S. §§ 201, *et seq.*, and the Texas Deceptive Trade Practices Consumer Protection Act, Tex. Bus. & Com. Code Ann. §§ 17.41, *et seq.*, in order to recover the amounts paid to Defendants for Vehicle Service Contracts that Defendants have failed to uphold as well as any other appropriate relief.

## PARTIES

**Plaintiff Jessica Cooper**

12.     Plaintiff Jessica Cooper ("Plaintiff Cooper") is a citizen and resident of Ohio.

13.     On April 18, 2024, Plaintiff Cooper purchased a Vehicle Service Contract from Endurance to provide coverage for her 2020 Ford F-150 vehicle. Exhibit A.

14.     Plaintiff Cooper paid approximately $4,475.94 for the "Secure Plus" plan. The length of coverage under the Vehicle Service Contract is four (4) years or 100,000 miles, whichever comes first.

15.     Defendants advertise that the "Secure Plus" plan "protects the most vital components of your vehicle," listing the transmission as a covered part:[12]

---

[12] https://www.endurancewarranty.com/coverage-plans/ (last visited March 19, 2025).

# Secure Plus

## Affordable coverage designed for older vehicles

**Protects the most vital components of your vehicle:**

- ✓ Engine
- ✓ Transmission
- ✓ A/C
- ✓ And more!
- ✓  See what's covered

16.    Specifically, Plaintiff Cooper's contract provides comprehensive coverage for the transmission:

> TRANSMISSION: (Automatic or Manual) Transmission Case and all Internally Lubricated Parts plus: Torque Converter; Flywheel/Flex Plate; Vacuum Modulator; Electronic Shift Control Unit; Transmission Cooler; Transmission Mounts; Oil Pan; Slave/Clutch Master Cylinder; Pilot Bearing; and Throw-Out Bearing. (Transmission case is covered if damage is due to the Breakdown of an internally lubricated part).

17.    Plaintiff Cooper purchased a Vehicle Service Contract from Defendants based on their advertisements and representations that her vehicle would be covered by the contract in the event it needed repairs, particularly for the parts listed on Endurance's website above.

18.    On or around May 22, 2024, Plaintiff Cooper experienced a transmission issue in her vehicle. Plaintiff Cooper brought her vehicle to a certified repair shop within Endurance's

approved network of mechanics. The mechanic diagnosed a transmission failure and recommended a transmission replacement.

19.     On May 22, 2024, Plaintiff Cooper filed a claim for coverage with Endurance. Even though the transmission was covered by Plaintiff Cooper's contract, Defendants failed to render a timely decision on her claim. Instead, Endurance delayed rendering a decision for more than one month.

20.     Finally, more than one month after Plaintiff Cooper's claim for coverage, Endurance denied her claim in full. When Plaintiff Cooper asked Endurance to provide the contractual basis upon which it relied for the denial decision, Endurance's customer service agents provided inconsistent responses.

21.     Based on Defendants' advertisements and representations, Plaintiff Cooper expected that her claim would be timely reviewed and approved under the Vehicle Service Contract.

22.     Plaintiff Cooper reasonably relied on Defendants' representations regarding coverage when purchasing a Vehicle Service Contract.

23.     Had Plaintiff Cooper known that coverage would be significantly delayed and ultimately denied, she would not have purchased a Vehicle Service Contract, or would have paid substantially less for it.

24.     As a result of Endurance's actions and inactions, Plaintiff Cooper incurred approximately $8,500 in out-of-pocket expenses.

25.     Plaintiff Cooper also lost full use of her vehicle while waiting for a decision from Endurance. Further, Plaintiff Cooper was forced to pay her monthly premium for Endurance during the pendency of her claim.

**Plaintiff Daniel Kujawa**

26.     Plaintiff Daniel Kujawa ("Plaintiff Kujawa") is a citizen and resident of Michigan.

27.     On April 9, 2024, Plaintiff Kujawa purchased a Vehicle Service Contract from Endurance to provide coverage for his 2013 Mercedes-Benz GL450 vehicle.  Exhibit B.

28.     Plaintiff Kujawa paid approximately $6,583.00 for the "Premier Plus" plan. The length of coverage under the Vehicle Service Contract is five (5) years or 60,000 miles, whichever comes first.

29.     Plaintiff Kujawa purchased a Vehicle Service Contract from Defendants based on their advertisements and representations that his vehicle would be fully covered by the contract in the event it needed repairs.

30.     On or around July 26, 2024, Plaintiff Kujawa experienced an engine failure. Plaintiff Kujawa brought his vehicle to a certified repair shop within Endurance's approved network of mechanics. The mechanic diagnosed a cylinder wall failure and recommended a full engine replacement. Plaintiff Kujawa received a quote of $13,514.79 for the necessary repair, inclusive of all required labor and parts.

31.     On July 26, 2024, Plaintiff Kujawa filed a claim for coverage with Endurance and provided the quote. Defendants failed to render a timely decision on his claim. Instead, Endurance represented to Plaintiff Kujawa that he would be required to request that the mechanic perform a lengthy and expensive tear down of the engine above and beyond the diagnosis that had already been performed. On October 14, 2024, Plaintiff Kujawa received an updated quote for engine replacement and the tear down in the amount of $19,056.50 and provided it to Endurance. Based on Endurance's representations, Plaintiff Kujawa authorized the tear down that day.

32.     The tear down did not alter or change the mechanic's initial diagnosis of a cylinder head failure and recommended engine replacement.

33.     On or around October 22, 2024, a third-party entity named Smart Auto Care, emailed Plaintiff Kujawa's mechanic stating that it would pay $7,000 toward Plaintiff Kujawa's claim.

34.     Plaintiff Kujawa contacted Endurance, which confirmed that Endurance would pay only $7,000 based on the value of Plaintiff Kujawa's vehicle at the time of filing a claim.

35.     Based on Defendants' advertisements and representations, Plaintiff Kujawa expected that his claim would be timely reviewed and fully approved under the Vehicle Service Contract.

36.     Plaintiff Kujawa reasonably relied on Defendants' representations regarding coverage when purchasing a Vehicle Service Contract.

37.     Had Plaintiff Kujawa known that coverage would be significantly delayed and/or partially denied, he would not have purchased a Vehicle Service Contract, or would have paid substantially less for it.

38.     As a result of Endurance's actions and inactions, Plaintiff Kujawa was forced to pay out-of-pocket for the necessary engine repair, in the amount of approximately $12,000. Additionally, Plaintiff Kujawa incurred out-of-pocket expenses for a car rental while his vehicle was awaiting Endurance's decision on repairs. Plaintiff Kujawa paid over $1,456.60 for the car rental.

39.     Plaintiff Kujawa also lost full use of his vehicle while waiting for a decision from Endurance. Further, Plaintiff Kujawa was forced to pay his monthly premium for Endurance during the pendency of his claim.

**Plaintiff Philip Rinella**

40.     Plaintiff Philip Rinella ("Plaintiff Rinella") is a citizen and resident of Pennsylvania.

41.     On July 1, 2022, Plaintiff Rinella purchased a Vehicle Service Contract from Endurance to provide coverage for his 2012 Honda Civic vehicle.  Exhibit C.

42.     Plaintiff Rinella paid approximately $2,634.10 for the "Select Premier" plan. The length of coverage under the Vehicle Service Contract is five (5) years or 75,000 miles, whichever comes first.

43.     Defendants' "Select Premier" plan is specifically designed to "cover[] older cars with up to 150,000 miles on the odometer," including "lubricated engine components, *transmission*," and more. (Emphasis added).[13]

44.     Specifically, Plaintiff Rinella's contract provides comprehensive coverage for the transmission:

> TRANSMISSION: All lubricated internal parts contained within the case. Computer modules & solenoids; filler tube & dipstick; vacuum modulator; and internal linkage. Transmission case ONLY if damaged by the Breakdown of a lubricated internal part.

45.     Plaintiff Rinella purchased a Vehicle Service Contract from Defendants based on their advertisements and representations that his vehicle would be covered by the contract in the event it needed repairs.

46.     On July 1, 2024, Plaintiff Rinella experienced a transmission issue in his vehicle. Plaintiff Rinella brought his vehicle to a certified repair shop within Endurance's approved

---

[13] https://www.endurancewarranty.com/learning-center/endurance-info/everything-about-endurance-extended-warranty-coverage/ (last visited March 19, 2025).

network of mechanics. The mechanic diagnosed an internal transmission failure and recommended a transmission replacement.

47.     That day, Plaintiff Rinella filed a claim for coverage with Endurance. Even though the transmission was covered by Plaintiff Rinella's contract, Defendants failed to render a timely decision on his claim. Instead, Endurance delayed rendering a decision for several months.

48.     Despite receiving a diagnosis from Endurance's approved mechanic, Endurance insisted that the mechanic tear down the transmission to determine the root cause of the failure. Plaintiff Rinella contacted three certified repair shops within Endurance's network of mechanics to request a teardown. Notably, all three shops declined to perform the teardown, stating that a teardown would not diagnose the failure any further than was previously diagnosed.

49.     Because none of Endurance's authorized mechanics will perform the teardown, Endurance refuses to render a decision on Plaintiff Rinella's claim. As of the date of this Complaint – ***more than 8 months after initiating a claim*** – Endurance has failed to approve Plaintiff Rinella's claim.

50.     Based on Defendants' advertisements and representations, Plaintiff Rinella expected that his claim would be timely reviewed and approved under the Vehicle Service Contract.

51.     Plaintiff Rinella reasonably relied on Defendants' representations regarding coverage when purchasing a Vehicle Service Contract.

52.     Had Plaintiff Rinella known that coverage would be significantly delayed and/or ultimately denied, he would not have purchased a Vehicle Service Contract, or would have paid substantially less for it.

53.     As a result of Endurance's actions and inactions, Plaintiff Rinella is forced to pay out-of-pocket for the necessary transmission repair, in the amount of approximately $7,227.81. Because Plaintiff Rinella is unable to pay for a costly repair, Plaintiff Rinella has been using another vehicle which is more expensive to operate and maintain than his Honda Civic.

54.     Plaintiff Rinella also lost full use of his vehicle while waiting for a decision from Endurance.

**Plaintiff Melissa Rumpf**

55.     Plaintiff Melissa Rumpf ("Plaintiff Rumpf") is a citizen and resident of Texas.

56.     On June 14, 2024, Plaintiff Rumpf purchased a Vehicle Service Contract from Endurance to provide coverage for her 2016 GMC Acadia vehicle.  Exhibit D.

57.     Plaintiff Rumpf paid approximately $4,518.00 for the "Platinum" plan. The length of coverage under the Vehicle Service Contract is five (5) years or 75,000 miles, whichever comes first.

58.     Coverage under the "Platinum" plan is one of the most comprehensive of Endurance's contracts, with only a handful of excluded components, none of which apply to Plaintiff Rumpf's claim.

59.     Additionally, coverage under the plan covers "Reasonable Costs," which is defined as:

> The repair costs that are recognized locally and/or nationally for a similar repair. We may use published parts and labor guides to establish Our costs. The Administrator reserves the right to determine recognized labor manuals. The maximum hourly labor rate that We will pay shall not exceed what is usual and customary where Your Vehicle's Breakdown occurred.

The Contract further states that "labor will be verified by one of the following nationally recognized labor guides: Forte or Identifix."

60.     Plaintiff Rumpf purchased a Vehicle Service Contract from Defendants based on their advertisements and representations that her vehicle would be fully covered by the contract in the event it needed repairs.

61.     On August 20, 2024, Plaintiff Rumpf experienced a transmission issue in her vehicle. Plaintiff Rumpf brought her vehicle to a certified repair shop within Endurance's approved network of mechanics. The mechanic diagnosed a transmission control module failure and recommended a transmission replacement. Plaintiff Rumpf received a quote for the necessary repair for approximately $7,500.00.

62.     That day, Plaintiff Rumpf filed a claim for coverage with Endurance and provided the quote. Even though the transmission was covered by Plaintiff Rumpf's contract, Defendants failed to render a timely decision on her claim. Instead, Endurance delayed rendering a decision for several months.

63.     One of the reasons for the delay was due to Endurance's unwillingness to pay the full labor rate of the certified repair shop within Endurance's approved network of mechanics. The repair shop's labor rate is approximately $193.00.  Plaintiff Rumpf was unable to find a repair shop within 75 miles of her home with a labor rate less than $175.00. Despite this, Endurance partially denied Plaintiff Rumpf's claim and refused to pay the repair shop's full labor rate. As a result, Endurance only provided approximately $1,000.00 towards the repair.

64.     Based on Defendants' advertisements and representations, Plaintiff Rumpf expected that her claim would be timely reviewed and approved under the Vehicle Service Contract.

65.     Plaintiff Rumpf reasonably relied on Defendants' representations regarding coverage when purchasing a Vehicle Service Contract.

66.     Had Plaintiff Rumpf known that coverage would be significantly delayed and/or partially denied, she would not have purchased a Vehicle Service Contract, or would have paid substantially less for it.

67.     As a result of Endurance's actions and inactions, Plaintiff Rumpf was forced to pay out-of-pocket for the necessary transmission repair, in the amount of approximately $6,500. Additionally, Plaintiff Rumpf incurred out-of-pocket expenses for a car rental while her vehicle was awaiting repairs. Plaintiff Rumpf paid over $500.00 for the car rental.

68.     Plaintiff Rumpf also lost full use of her vehicle while waiting for a decision from Endurance. Further, Plaintiff Rumpf was forced to pay her monthly premium for Endurance during the pendency of her claim.

**Plaintiff Matthew Wilder**

69.     Matthew Wilder ("Plaintiff Wilder") is a citizen and resident of New Jersey.

70.     On July 2, 2024, Plaintiff Wilder purchased a Vehicle Service Contract from Endurance to provide coverage for his 2018 Ford Escape vehicle.  Exhibit E.

71.     Plaintiff Wilder paid approximately $4,518.38 for the "Secure Plus" plan. The length of coverage under the Vehicle Service Contract is four (4) years or 100,000 miles, whichever comes first.

72.     Defendants advertise that the "Secure Plus" plan "protects the most vital components of your vehicle," listing the transmission as a covered part:[14]

---

[14] https://www.endurancewarranty.com/coverage-plans/ (last visited March 19, 2025).

# Secure Plus

## Affordable coverage designed for older vehicles

**Protects the most vital components of your vehicle:**

✓ Engine

✓ Transmission

✓ A/C

✓ And more!

✓ See what's covered

73. Specifically, Plaintiff Wilder's contract provides comprehensive coverage for the transmission:

> TRANSMISSION: (Automatic or Manual) Transmission Case and all Internally Lubricated Parts plus: Torque Converter; Flywheel/Flex Plate; Vacuum Modulator; Electronic Shift Control Unit; Transmission Cooler; Transmission Mounts; Oil Pan; Slave/Clutch Master Cylinder; Pilot Bearing; and Throw-Out Bearing. (Transmission case is covered if damage is due to the Breakdown of an internally lubricated part).

74. Plaintiff Wilder purchased a Vehicle Service Contract from Defendants based on their advertisements and representations that his vehicle would be covered by the contract in the event it needed repairs, particularly for the parts listed on Endurance's website above.

75. On or around August 2, 2024, Plaintiff Wilder experienced a transmission issue in his vehicle. Plaintiff Wilder brought his vehicle to a certified repair shop within Endurance's approved network of mechanics. The mechanic diagnosed a transmission failure and

recommended a transmission replacement. Plaintiff Wilder received a quote for the necessary repair for approximately $9,055.13.

76.     That day, Plaintiff Wilder filed a claim for coverage with Endurance. Even though the transmission was covered by Plaintiff Wilder's contract, Defendants failed to render a timely decision on his claim. Instead, Endurance delayed rendering a decision for more than one month.

77.     Instead, Endurance represented to Plaintiff Wilder that he would be required to request that the mechanic perform a tear down of the transmission above and beyond the diagnosis that had already been performed. Based on Endurance's representations, Plaintiff Wilder authorized the tear down.

78.     The tear down did not alter or change the mechanic's initial diagnosis of a transmission failure and recommended transmission replacement.

79.     Finally, more than one month after Plaintiff Wilder's claim for coverage, Endurance denied his claim in full based on an unspecified "pre-existing condition." When Plaintiff Wilder asked Endurance to provide additional information upon which it relied for the denial decision, Endurance's customer service agents refused.

80.     At no time before or during the purchase process did Endurance inspect Plaintiff Wilder's vehicle or ask Plaintiff Wilder information about the present condition of the vehicle, such as any known issues with the vehicle. Moreover, Plaintiff Wilder was unaware of any issues with his vehicle at the time he purchased the Vehicle Service Contract.

81.     Based on Defendants' advertisements and representations, Plaintiff Wilder expected that his claim would be timely reviewed and approved under the Vehicle Service Contract.

82.     Plaintiff Wilder reasonably relied on Defendants' representations regarding coverage when purchasing a Vehicle Service Contract.

83.     Had Plaintiff Wilder known that coverage would be significantly delayed and ultimately denied, he would not have purchased a Vehicle Service Contract, or would have paid substantially less for it.

84.     As a result of Endurance's actions and inactions, Plaintiff Wilder incurred approximately $9,055.13 in out-of-pocket expenses.

85.     Plaintiff Wilder also lost full use of his vehicle while waiting for a decision from Endurance. Further, Plaintiff Wilder was forced to pay his monthly premium for Endurance during the pendency of his claim.

**Defendants**

86.     Defendants advertise, market, sell, and administer Vehicle Service Contracts.

87.     Defendant Endurance Dealer Services, LLC is a limited liability company registered under the laws of Illinois. Endurance Dealer Services, LLC is located at 400 Skokie Blvd., Suite 105, Northbrook, Illinois 60062.

88.     Defendant Endurance Warranty Services, LLC is a limited liability company registered under the laws of Illinois. Endurance Warranty Services, LLC is located at 400 Skokie Blvd., Suite 407, Northbrook, Illinois 60062.

89.     Upon information and belief, Plaintiffs allege that at all times mentioned herein, each and every Defendant was acting as an agent and/or employee of each other, and at all times mentioned was acting within the course and scope of said agency and/or employment with the full knowledge, permission, and consent of each other. In addition, each of the acts and/or omissions of each Defendant alleged herein were made known to, and ratified by, each Defendant.

## JURISDICTION AND VENUE

90.     This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1332 of the Class Action Fairness Act of 2005 because: (i) there are 100 or more class members, (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs, and (iii) there is minimal diversity because at least one plaintiff and one defendant are citizens of different states. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

91.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because Defendants transact business in this district, are subject to personal jurisdiction in this district, and therefore are deemed to be citizens of this district. Additionally, a substantial part of the events or omissions giving rise to the claim occurred in this district, Defendants have advertised in this district, and Defendants have received substantial revenue and profits from its sales of Vehicle Service Contracts in this district.

92.     This Court has personal jurisdiction over Defendants because they have conducted substantial business in this judicial district, and intentionally and purposefully sold Vehicle Service Contracts within the state of Illinois and throughout the United States. Defendants also maintain their corporate headquarters in this district.

## FACTUAL ALLEGATIONS

**Vehicle Service Contracts**

93.      A Vehicle Service Contract is distinct from a manufacturer's warranty. For one, "[a] manufacturer's warranty is included in the price of a new vehicle."[15] A Vehicle Service Contract, on the other hand, is purchased separately from a vehicle and negotiated between a consumer and either a manufacturer, dealer, or third-party claims administrator.

94.      Further, a manufacturer's warranty "often covers your vehicle for a certain number of months or miles, whichever comes first."[16] A Vehicle Service Contract, on the other hand, often provides coverage beyond the manufacturer's warranty, either by adding additional months or miles to a vehicle's coverage or by promising to cover more repairs.

95.      Defendants market, sell, and administer Vehicle Service Contracts. According to Defendants, Endurance is the direct administer of Endurance Vehicle Service Contracts (as opposed to being a third-party seller), which, according to Endurance, allows for Endurance to approve claims faster and makes the claims process "much smoother (and less stressful)."[17]

---

[15] https://consumer.ftc.gov/articles/auto-warranties-and-auto-service-contracts (last visited March 19, 2025).

[16] https://consumer.ftc.gov/articles/auto-warranties-and-auto-service-contracts (last visited March 19, 2025).

[17] https://www.endurancewarranty.com/learning-center/comparisons/endurance-vs-complete-auto-care/; https://www.endurancewarranty.com/learning-center/company-resources/best-practices-for-filing-a-claim-with-endurance-warranty/ (last visited March 19, 2025).

96.     Defendants offer six protection plans: Advantage, Supreme, Premier, Superior, Secure, and Secure Plus.[18] Defendants provide examples of coverage on their website:

# Superior

### Extensive coverage that protects a wide range of components

**Protection for the most common parts that break down over time:**

- ✓ Engine
- ✓ Transmission
- ✓ A/C
- ✓ Fuel system
- ✓ Electrical
- ✓ High-tech options
- ✓ And more!

# Secure Plus

### Affordable coverage designed for older vehicles

**Protects the most vital components of your vehicle:**

- ✓ Engine
- ✓ Transmission
- ✓ A/C
- ✓ And more!
- ✓ See what's covered

# Supreme

### Most comprehensive coverage available

**Closest to new manufacturers' warranty protection:**

- ✓ Engine
- ✓ Transmission
- ✓ A/C
- ✓ Fuel system
- ✓ Electrical
- ✓ High-tech options
- ✓ Seals & Gaskets
- ✓ Cooling system
- ✓ Transfer case
- ✓ Drive axle
- ✓ And more!

---

[18] https://www.endurancewarranty.com/sample-contracts/ (last visited March 19, 2025).

97.     Each plan offers a different level of coverage, with the Advantage plan offering the most comprehensive coverage.[19]

98.     To initiate a claim, a consumer must take their vehicle to one of Endurance's approved repair facilities and submit a claim for coverage. Once the claim has been submitted, Endurance reviews the claim and either approves or denies coverage.[20]

99.     If the claim is approved, the cost of a covered claim is paid directly to the repair facility by Endurance, and the consumer will be responsible for any deductibles or expenses not approved by Endurance.[21] If a claim is partially or fully denied, a consumer must pay for the costs of repair out of pocket.

**Defendants Engage in False, Deceptive, and Misleading Advertising**

100.     Defendants' conduct amounts to false, deceptive, and misleading advertising in at least three ways: (1) Defendants are not the direct administrators for all of their contracts, despite claiming they are; (2) Defendants promise timely full coverage and then subsequently deny covered claims; and (3) Defendants employ scare tactics and other unfair and misleading conduct to induce contracts that do not offer the promised coverage.

101.     **False Claims about Being Direct Administrator.** Defendants induce consumer contracts by falsely claiming they are the direct administrators of their Vehicle Service Contracts. Defendants attempt to distinguish themselves from their competition by highlighting that they

---

[19] *Id.*
[20] https://www.endurancewarranty.com/learning-center/company-resources/best-practices-for-filing-a-claim-with-endurance-warranty/ (last visited March 19, 2025).
[21] https://www.endurancewarranty.com/faq/ (last visited March 19, 2025).

administer their own Vehicle Service Contracts.[22] Indeed, Endurance claims that being the direct administrator provides benefits to consumers, including expedited claims processes, more approved claims, and an overall more seamless experience.[23] Endurance makes these statements in order to induce sales of their Vehicle Service Contracts.

102.    Moreover, following a sale of a contract, consumers, including Plaintiffs receive a welcome packet from Endurance with Endurance's name and logo on the documents. The below photos depict portions of a welcome packet Endurance provides to new customers.



# Plan Booklet

**EXTENDED VEHICLE COVERAGE PROGRAM**

---

[22] https://www.endurancewarranty.com/learning-center/comparisons/endurance-vs-complete-auto-care/; https://www.endurancewarranty.com/learning-center/company-resources/best-practices-for-filing-a-claim-with-endurance-warranty/ (last visited March 19, 2025).
[23] *See id.*



Welcome to the Endurance Family!

Congratulations on the purchase of this Vehicle Service Contract.

## EMPOWERING CONFIDENCE
## FOR THE ROAD AHEAD

**400 Skokie Blvd., Suite 105**
**Northbrook, Il 60062**

**@endurance**          **facebook.com/endurancewarranty**

**WWW.ENDURANCEDIRECT.COM**

103.    Despite Defendants' representations that they are the direct administrators of their Vehicle Service Contracts, Endurance is **not** the direct administrator of all its contracts.

104.    For example, Plaintiff Kujawa's contract states that an unknown, non-disclosed third-party entity, "Ownershield, Inc.," is the administrator of his contract, despite Endurance's

representations that Endurance is the administrator of his contract. More troubling, following Plaintiff Kujawa's claim for coverage under the contract, Plaintiff Kujawa received correspondence regarding Endurance's decision through another third-party entity, "Smart Auto Care." Neither Ownershield, Inc. nor Smart Auto Care are disclosed as affiliates or subsidiaries of Endurance on Endurance's website and other materials.

105.     In another example, Plaintiff Rumpf's contract states that an unknown, non-disclosed third-party entity, "DKP Administration, Inc.," is the entity Plaintiff Rumpf entered a contract with, despite only communicating with Endurance and receiving a welcome packet containing the contract from Endurance. More troubling, within the same document, another third-party entity, "Gold Key Warranty, LLC DBA Consumer Care Direct," is the administrator of her contract.

106.     Thus, consumers, including Plaintiffs, do not receive the purported benefits Defendants claim to provide as a direct administrator of their Vehicle Service Contracts.

107.     These are by no means isolated incidents. Upon information and belief, Endurance is not the direct administrator of several other contracts it sells to consumers.

108.     **False Promises for Coverage.** Defendants promote Endurance as the ultimate safeguard against unexpected vehicle repair costs, presenting bold slogans such as "never pay for covered car repairs again," "complete coverage you can count on," and "reliable coverage that pays."[24]

---

[24] https://www.endurancewarranty.com/; https://www.endurancewarranty.com/why-endurance/ (last visited March 19, 2025).

# Never pay for covered car repairs again.

## Complete coverage you can count on.

# Reliable coverage that pays.

109. Endurance further claims that "there's no hassle and no runaround – just personalized protection to endure you get the coverage your vehicle really needs."

110. Indeed, Defendants go to great lengths to target consumers with older and higher mileage vehicles: "[A]t Endurance, each Advantage plan will help cover you from expensive and unexpected repairs, including vehicles with over 200,000 miles. In fact, with the Prime level of

coverage with Advantage, vehicles up to 20 years old can get covered with no mileage limits."[25]
Below is a photo depicting one of Endurance's advertisements discussing its coverage of high
mileage vehicles:[26]



**HIGH MILEAGE CAR REPAIRS**

| | WITHOUT ENDURANCE | WITH ENDURANCE |
|---|---|---|
| ENGINE | $1,000 - $6,000 | $0 |
| TRANSMISSION | $1,500 - $5,000 | $0 |
| FUEL SYSTEM | $500 - $1,000 | $0 |
| DRIVESHAFT | $500 - $1,500 | $0 |

111.    Endurance's promises are amplified through high-profile endorsements, such as
Professional Racecar Driver Danica Patrick. She states, "One way to avoid expensive car repair
bills is to be a racecar driver. The other is Endurance. You could never pay for covered car repairs
again." Patrick further declares, "Without Endurance, breakdowns can cost thousands. With
Endurance, you're covered."[27] "Having spent many years in the racing industry, I understand the

---

[25] https://www.endurancewarranty.com/learning-center/extended-warranty/over-150k-miles/#:~:text=Like%20the%20other%20levels%20of,covered%20with%20no%20mileage%20limits. (last visited March 19, 2025).

[26] https://www.endurancewarranty.com/learning-center/extended-warranty/over-150k-miles/ (last visited March 19, 2025).

[27] https://www.endurancewarranty.com/hear-from-danica/ (last visited March 19, 2025).

high cost of unexpected breakdowns. Endurance provides drivers with the peace of mind they need to keep their vehicles running smoothly, and I am thrilled to be a part of that."[28]



112. Defendants further claim that consumers can select their own mechanic, as celebrity endorser Patrick states, "You pick the mechanic you trust":[29]

113. Endurance further claims that their plans "are honored at any licensed repair facility anywhere in the nation. These facilities include dealerships, chain shops, or your local repair

---

[28] https://www.endurancewarranty.com/learning-center/press/racecar-driver-danica-patrick-teams-up-with-endurance/ (last visited March 19, 2025).
[29] https://www.endurancewarranty.com/hear-from-danica/ (last visited March 19, 2025).

shop."[30] Endurance purportedly refers consumers to "expertly certified mechanics nationwide," to ensure that "covered warranty work gets done correctly the first time…customers get peace of mind by knowing that qualified technicians use industry-standard methods and quality parts."[31]

114.     By leveraging celebrity credibility, Endurance aims to instill trust and reliability in their services.

115.     Endurance also emphasizes that their plans cover a wide array of vehicles, stating that "no matter how new or well-maintained your vehicle is, it will eventually need repairs. With Endurance on your side, you can get back on the road fast. Just give us a call and we'll take care of the rest.[32]

116.     Defendants emphasize the simplicity of their process, promising a "stress-free claims process" that takes as "little as 48 hours," and, in some cases, as little as just a few minutes.[33]



Endurance gives you real peace of mind by mitigating the high costs that come with unexpected repairs. Unlike other providers, our stress-free claims process means you get approved in as little as 48 hours.

---

[30] https://www.endurancewarranty.com/learning-center/company-resources/use-extended-warranty/ (last visited March 19, 2025).
[31] https://www.endurancewarranty.com/learning-center/company-resources/repairpal-network-for-qualified-mechanics/ (last visited March 19, 2025).
[32] https://www.endurancewarranty.com/ (last visited March 19, 2025).
[33] https://www.endurancewarranty.com/why-endurance/; https://youtu.be/mSoAplDCxrA  (last visited March 19, 2025).

117.    Defendants proudly claim to have paid "over $300 million in claims," highlighting their purported reliability. They emphasize the simplicity of their process, reassuring potential clients that there are "no out-of-pocket expenses" beyond a $100 deductible.

118.    Defendants induce consumers into purchasing Endurance Vehicle Service Contracts based on the guise that their plans cover nearly, if not all, repairs, alleviate the financial burden of unexpected car repairs, and take advantage of unsuspecting consumers who are tricked into believing Endurance is a trusted leader in vehicle protection.[34]

119.    However, as described herein, Endurance's Vehicle Service Contracts do not live up to Endurance's advertisements and representations.

120.    **Scare Tactics to Induce Sales.** Endurance employs sales representatives to sell Vehicle Service Contracts to consumers. Upon information and belief, sales representatives are paid a commission for each contract sold. Upon information and belief, Endurance provides their sales representatives with call scripts which contain aggressive sales tactics and scare tactics to induce sales. For example, sales representatives are directed to scare consumers that consumers' vehicles are prone to suffering from certain failures and that they will be subject to high-cost repair bills.

121.    Additionally, Endurance instructs their sales representatives to omit material information about coverage under the contract. Despite a plethora of exclusions under the contract, sales representatives are instructed to represent that all components of a vehicle are covered under the Vehicle Service Contract. Upon information and belief, sales representatives are instructed to refrain from presenting the entire contract to consumers before finalizing the sale. Moreover, upon

---

[34] *See* https://www.endurancewarranty.com/learning-center/company-resources/best-practices-for-filing-a-claim-with-endurance-warranty/ (last visited March 19, 2025).

information and belief, sales representatives omit critical information about how they may cancel coverage and any applicable cancellation fees.

122.    Defendants have faced significant regulatory and consumer scrutiny. Notably, the Oregon Department of Justice ("DOJ") investigated Endurance following numerous consumer complaints about Endurance's advertising and solicitations.[35] The Oregon DOJ found that Endurance had misled thousands of Oregon consumers. The Oregon DOJ and Endurance reached a settlement in December 2022 that imposed a substantial $550,000 fine and mandated a rigorous independent review of Endurance's advertising directed at Oregon residents. Furthermore, it barred the company from engaging in unsolicited phone calls in the state for five years, reflecting the seriousness of the violations.

**Defendants' Pattern of Delaying and Denying Claims**

123.    Despite promises of a swift and straightforward claims process, Defendants consistently employ calculated delay tactics to avoid fulfilling their contractual obligations. Rather than facilitating seamless claim resolutions, Endurance's methods create significant barriers for consumers attempting to secure coverage under their contracts.

124.    Consumers report being subjected to frustrating and redundant procedures. Instead of proactively communicating what is needed to process claims, Defendants force consumers to repeatedly reach out for updates. Each time consumers call, they are met with new customer service agents who provide conflicting information, often stating that all necessary documentation has been received, only to later request additional materials such as photographs, vehicle

---

[35] https://www.kgw.com/article/news/investigations/oregon-doj-car-warranties-company/283-db3a8879-3f90-4002-9e35-ee57021f963d (last visited March 19, 2025).

maintenance records, or other documents. This cycle repeats, unnecessarily delaying the claims process.

125.    Further, Defendants often require repair shops to perform superfluous labor after diagnosing the problem and recommending repairs. Not only are these demands excessive, but Endurance also refuses to compensate the repair shops for this additional work. These tactics effectively delay the decision-making process, forcing consumers to absorb costs and endure prolonged inconvenience.

126.    Even after consumers comply with all demands and submit the required documentation, Defendants routinely deny legitimate claims without sufficient explanation. Denials are issued without referencing specific contract exclusions, leaving consumers with substantial repair bills, out-of-pocket expenses caused by waiting for untimely repairs, out-of-pocket monthly premiums for their Endurance contract, and lost use of their vehicles. These practices not only contradict the Defendants' assurances but also cause significant financial harm to consumers.

127.    Defendants' delay tactics highlight a systematic approach aimed at minimizing payouts rather than delivering on the promised protection, raising serious concerns about the Defendants' adherence to their contractual commitments.

**Defendants Violate Their Contracts With Consumers**

128.    In addition to the above violations, Defendants blatantly disregard several provisions within their own contracts.

129.    **Pre-Existing Conditions.** When consumers file claims for coverage, they are frequently informed that their claims are denied due to a supposed pre-existing condition. Endurance defines pre-existing conditions as "a condition that within all reasonable mechanical

probability relates to the mechanical condition of your vehicle prior to contract issuance or during the waiting period." However, these alleged pre-existing conditions are conspicuously absent from any prior documentation, such as vehicle service records or maintenance history.

130.    As described herein, Defendants are in the business of selling Vehicle Service Contracts for older vehicles with high mileage. Defendants do not perform vehicle inspections at the time of sale or require consumers to obtain independent inspections from a dealership or mechanic before Defendants sell Vehicle Service Contracts to consumers. Indeed, all Defendants require from consumers at the time of sale is their vehicle's make, model, year, and mileage. As a result, neither Defendants nor consumers, have knowledge of any alleged pre-existing conditions.

131.    Thus, Defendants deny claims based on undocumented and unverifiable pre-existing conditions. Such denials are improper, unjustified, and exhibit a deliberate strategy to avoid honoring contractual obligations.

132.    As a result, consumers, including Plaintiff Wilder, are forced to incur out-of-pocket costs to repair their vehicles.

133.    **Labor Rates.** When consumers file claims for coverage, Endurance refuses to cover the full cost of parts and/or labor. Defendants claim to use "nationally recognized parts and labor time guides" to determine the reasonable costs of labor and parts but fail to disclose the source or the specific labor rates used.

134.    Defendants' practice of using various labor rate guides is problematic for several reasons. First, even where Defendants disclose the sources of labor rates, Defendants provide two or more labor guides from which Defendants may select in reviewing a consumer's claim for coverage. Thus, consumers, including Plaintiff Rumpf, do not know which labor guide applies.

135.    Second, the labor guides used by Defendants are not publicly available. Indeed, one must sign up for a paid subscription in order to access the data contained within the labor guides. Thus, consumers are deprived of the opportunity to review the terms of the labor guide before or after sale of their Vehicle Service Contracts.

136.    Third, Defendants emphasize that consumers may choose their repair facility, but subsequently limit their liability by refusing to pay the labor rates charged by those facilities. When consumers request the labor guide allegedly used to justify these denials, Defendants consistently withhold this information.

137.    Defendants' systematic underpayment of labor rates, refusal to disclose the labor guide, and failure to inform consumers of these limitations constitute material breaches of contract and deceptive omissions. Moreover, Defendants only inform consumers of their refusal to pay the repair facilities' labor rates *after* repair facilities already performed the work. Thus, consumers are deprived of the decision to either decline a repair, take their vehicle elsewhere, or attempt to fix their vehicle themselves.

138.    As a result, consumers are left with no choice but to cover the repair costs out of pocket in order to retrieve their vehicles from the repair facility.

139.    **Limitation of Liability.** Endurance's Vehicle Service Contracts impose a significant limitation on liability, restricting coverage to the lesser of a specific dollar amount, such as $10,000 or the "NADA average trade-in value at the time of the Covered Repair and/or Benefits."

140.    Upon information and belief, Endurance has the ability to assess a vehicle's trade-in value when issuing a Vehicle Service Contract, factoring in the vehicle's price and mileage to

determine coverage terms. However, Endurance frequently denies claims or limits payments based on a trade-in value cap, leaving consumers with repair costs that far exceed the coverage offered.

141. Upon information and belief, Endurance is aware of the trade-in value at the time of contracting or at the time consumers submit claims for coverage. Despite this knowledge, Endurance sells coverage for expensive repairs, such as engine replacements, knowing such repairs could easily exceed their limit of liability. Further, Endurance routinely demands expensive diagnostic procedures, such as vehicle tear-downs, knowing full well the total claim payout will not cover the costs of diagnostics and/or repair costs.

142. As discussed, Endurance markets Vehicle Service Contracts with coverage limits that are grossly inadequate to cover the advertised coverage for major repairs, effectively undermining the essential purpose of the contract. Further, Endurance only notifies consumers of their limited coverage *after* repair facilities begin repairs. Thus, consumers are deprived of the decision to either decline a repair, take their vehicle elsewhere, or attempt to fix their vehicle themselves.

143. As a result, consumers are forced to incur out-of-pocket costs to repair their vehicles.

**Consumer Experiences**

144. The conduct described herein cannot be attributed to isolated incidents. Indeed, counsel for Plaintiffs have been contacted by hundreds of putative class members with complaints about Defendants' conduct as described herein.

145. Further, the internet is further replete of thousands of consumer complaints, including complaints on prominent consumer websites, including the Better Business Bureau and Consumer Affairs.

146.     Below is just a mere smattering of the tens of thousands of complaints online:[36]

a.     On November 22, 2024, a consumer wrote: "I purchased my Secure Plus warranty in 2023. This was the biggest mistake I ever made. When I filed a claim in 2024 the claim was denied. When inquiring about the denial no one could explain why it didn't pay when my contract stated the repairs was covered. The repair shop and I emailed the list of repairs needed. Long story short I paid out of pocket over 4,000 for engine repairs and rental while my vehicle was being repaired."[37]

b.     On November 18, 2024, a consumer wrote: "I purchased an extended warranty on October 9, 2024 for $155 in hopes that if my car had major issues then I would be covered. As it was explained that all repairs would be covered with an out of pocket cost of $100 for my deductible. Well that is not what occurred, my car failed inspection so I contacted Endurance to inquire how to file a claim which they provided. On November 18, 2024 I took my vehicle to get diagnosed and then was informed by the mechanic of an approved business by Endurance; that none of my repairs would be covered; which totaled over $2000 worth of damage and I also had an out of pocket expense of $169 for the diagnostic test that was performed. When I contacted them to cancel since it would not serve a purpose to have a warranty if my car could not be covered, they decided to offer a higher package, links to purchase discounted parts and applying for a line of credit to help off set cost. After refusing the higher package and stating that it did not make sense to have to pay all the extra money to repair my car, when I am already paying them. After refusing the link and higher package; I was then informed that I had to sign a cancellation form that I also had to have it notarized in order to properly cancel my membership. So not only did they not cover the cost, I had to pay a higher cost than expected since the diagnosis was included in the cost of the repair which now they were not paying. In addition to not having my vehicle repaired; I also have to pay a notarization fee of $10 in order to have it cancelled which was not stated when I initially purchased the warranty."[38]

c.     On November 17, 2024, a consumer wrote: "I purchased the Endurance because we bought a older truck and after been told all the lies from them signed up. When we got the contract it was written so small it could not be read especially by 76 year old. Took several calls to get the card. They changed the payment to

---

[36] The following complaints are reproduced as they appear online. Any typographical errors are attributable to the original author.

[37] https://www.consumeraffairs.com/auto_warranty/endurance-warranty.html?page=1#sort=recent&filter=1 (last visited March 19, 2025).

[38] https://www.bbb.org/us/il/northbrook/profile/auto-warranty-plans/endurance-warranty-services-llc-0654-88077689/complaints (last visited March 19, 2025).

the prime program to something else and increased my payment to $165.00 monthly. They make it hard to cancel program. They refused to pay for service on our first repairs. If it sounds too good to be true, DON'T DO IT!!! They require you to have cancellation notarized. There is so much more to tell you about, but don't see the point. BUYERS BEWARE!!!!"[39]

d. On November 15, 2024, a consumer wrote: "Don't waste your money with Endurance. I've had plenty of extended warranties and dealt with many different companies. Endurance utilizes a 3rd party claims department to put someone in between the customer and the company. They will look for every way possible to reject your claim and if you try and talk to someone about it, you get the runaround like nothing I have ever experienced. It's unfortunate they have forgotten why they are in business - to assist a customer rather than create a system that makes it difficult to get a problem resolved!"[40]

e. On November 15, 2024, a consumer wrote: "Have been with Endurance for over a year. When my transmission was going out in my 2018 Toyota Tacoma I took it to my dealership for a diagnostic as required. Endurance sent an adjuster out and denied my claim immediately. I was never sent any paperwork when I enrolled. They denied my claim because they said it had a leak on the tail shaft. Mind you there were no leaks visible in my carport or during the oil change 2 weeks before. This is a sealed transmission therefore there is no dipstick to check transmission fluid levels and no leaks were detected either in the carport or during the oil change. The 2nd excuse for denying the claim was because we drove it to the dealership, a short distance away and they claimed it should have been towed because driving it 3 miles to the dealership caused more damage. My dealership disagreed with the decision and spoke to a senior adjuster to appeal the decision. He was basically blown off by the senior adjuster. This company is a ripoff and refuses to pay eligible claims. I was advised by my service director to drop my coverage with them. That also turned out to be a horror story within itself. If I could rate them a negative amount of stars I definitely would. Now I'm having to pay over $6000 out of pocket for a new transmission."[41]

f. On November 14, 2024, a consumer wrote: "I signed up with this Endurance. My vehicle is 10 years old. The promises made, I would be covered with a comprehensive bumper to bumper policy. 7 months later, I had an issue and

---

[39] https://www.consumeraffairs.com/auto_warranty/endurance-warranty.html?page=1#sort=recent&filter=1 (last visited March 19, 2025).

[40] *See id.*

[41] *See id.*

35

submitted a part repair. It was rejected and told it wasn't covered on their printed list of coverages. I list over $700.00. This is a deceptive company, be aware of the lies promoted on TV ads. No regulations enforced of these companies."[42]

g. On November 11, 2024, a consumer wrote: "I got the premium warranty and they denied the first claim on the basis of the age and mileage of my Audi A5, which only has 35,000 miles and is 6 years old; the rep that sold my the plan said that they covered suspension, anti lock brakes, etc but denied sway bars, a total misrepresentation, I would not recommend this to anyone, it is a total rip off and waste of money."[43]

h. On November 11, 2024, a consumer wrote: "Endurance Warranty lied when they sold me this policy. The sales man said that it would cover virtually everything. He boasted about how much better they were than Car Shield. I have filed two claims, both denied. I just paid $800 to ******** to replace my Ambien sensor plus $131.00 monthly for 2 years and still paying for the warranty. Please see my attached receipt. I am utterly disgusted and heartbroken with the lies these car Warranty companies tell to get you to sign up then they pay nothing when you file a claim. They find ways to deny your claims while their executives and sales people make quotas and big fat checks off the backs of hard working African Americans. The government needs to investigate these companies as they lie and steal money and no one holds them accountable. Had I known they would deny my claims and find ways not to pay for claims, I would have never purchased this warranty. I have paid over 4k for them to cover absolutely nothing! Desired resolution for them to refund my $800.00 which they should have paid in the first place. I have no control as to how something behind a bumper got damaged. That is why I purchased a warranty so when parts get damaged, you fix it. I had to save money so I could have my car repaired."[44]

i. On November 6, 2024, a consumer wrote: "I have policy since beginning of November 2023. My vehicle has problem with transmission. I brought it to licensed repair shop on 11/04/2024. I was told that inspector was assigned on 11/04/2024 at 10:18am to come and inspect vehicle to state coverage of repairs, and that it should happen 24-48hrs from that time and date. Today is 11/06/2024 4:28pm and no calls or visits from inspector was done. It is a waste of my time and money and services, which Endurance insurance claims to provide to

---

[42] *See id.*

[43] *See id.*

[44] https://www.bbb.org/us/il/northbrook/profile/auto-warranty-plans/endurance-warranty-services-llc-0654-88077689/complaints (last visited March 19, 2025).

customers is non existent. Customer ********************** and promised services do not exist at this company, and I guess they pay for reviews to ****** new customers. No one can provide information about my claim ether. This company is a fraud."[45]

j.  On October 17, 2024, a consumer wrote: "Very misleading. They represented their selves as my current warranty company saying its about to expire. I told them to sign me up for a new term but after checking I found out my warranty didn't expire for another seven months. I was told I could cancel and receive a full refund. I called to cancel and was told I have to get a notarized cancelation notice to them to cancel contract. After charging me over 300 dollars I sent a second notarized cancelation form. This time after almost a month they sent a 104 dollar check. From my opinion this company "Endurance" is a total scam. Just check some of their answers to questions and they said 300 to 700 a year. After 300 over a three month period, that seems to be another misleading lie."[46]

k.  On October 16, 2024, a consumer wrote: "If I could, I'd give them a 0. This company had our vehicle in the shop for over 2 months just to come back and deny the claim and state an issue completely opposite of what the body shop advised. I'd go the opposite direction if I were you."[47]

l.  On October 13, 2024, a consumer wrote: "HORRIBLE!! I've spent thousands of dollars on this policy. I purchased the best tier.. never have had to use them in 3 years. My jeep went in for repair and they refused to pay any of it. Not to mention they were above and beyond Rude to me and the mechanic at the dealership. This company is a Total SCAM!!"[48]

m.  On October 10, 2024, a consumer wrote: "No rating for Endurance from me. I bought a used vehicle that had no warranty so I got Endurance warranty for my car. About 2 and half months after AC went out and took it to repair shop. They filed for repairs for AC and Endurance denied the claim for the inner coil of the AC compressor which you can't get another without the coil because it automatically is part of a compressor. The compressor will not work without it. My coverage with Endurance covers complete AC repairs and nowhere on contract does it state that the coil isn't included or claimable. It does state that

---

[45] https://www.bbb.org/us/il/northbrook/profile/auto-warranty-plans/endurance-warranty-services-llc-0654-88077689/complaints?page=3 (last visited March 19, 2025).
[46] https://www.consumeraffairs.com/auto_warranty/endurance-warranty.html?page=3#sort=recent&filter=1 (last visited March 19, 2025).
[47] *See id.*
[48] *See id.*

the AC compressor is included in complete AC repairs and which the coil is part of the compressor."[49]

n.  On October 10, 2024, a consumer wrote: "Please move on to another warranty company. I chose Endurance because of their positive reviews, but they were lies! Unfortunately, I actually had an issue with my vehicle and when it came time for Endurance to approve the claim they didn't, and to make matters worse the customer service agent lied to my husband about why. When my husband contacted the dealership confused about what Endurance said, they confirmed that that was never said. Endurance is shady and will do anything to avoid dealing with your vehicle repairs. If you want to avoid a headache and being put into a terrible position, please look for another company."[50]

o.  On October 10, 2024, a consumer wrote: "I paid them over $600 with nothing to show for. They took over a month until they received payment again from me just to denied my claim due to repairs shop's failing to report maintenance work on my car for an oil change. So when I questioned them about it, they never replied with a direct answer. The representatives were all rude when questioned and treated me like I was harassing them They buy good reviews but no real people I know had a good experience with them. I ask them what else are they going to assist me with and they refer back to the contract with no clarity. The money I spent on the them for nothing I could have spent it on getting my car repaired on my own. They are some swindlers with paid reviews."[51]

p.  On October 9, 2024, a consumer wrote: "Do not be fooled by the positive reviews about Endurance Warranty. They will find every way and use every excuse to deny your claim. This organization is a scam and will gladly take your money and then deny your claim. I had a transmission problem. Endurance demanded that the dealer drop and disassemble the transmission and then denied the claim. I have a car without a transmission. The shop is demanding $1800.00 for taking the transmission out and inspecting it. If I put a new rebuilt transmission in it will cost a minimum of $6500.00. Endurance claims no responsibility for having my car in the shop for 30 days while they got around to sending a adjuster, mandating the transmission be removed or standing by the contract. AVOID THIS COMPANY!!!"[52]

---

[49] *See id.*
[50] *See id.*
[51] *See id.*
[52] *See id.*

q. On October 8, 2024, a consumer wrote: "This is a scam! They do not return your calls. We have been trying to cancel this before the 30 days. They will not return calls! We have turned them into the FTC. And the BBB. The reviews are lies! This is not a reputable business. It has nothing to do with GMC."[53]

r. On October 7, 2024, a consumer wrote: "This warranty is a complete joke. Had it for 4 years the first time we tried to use it. They denied and canceled it yet keep sending advertisements to us. They refused to pay on a transmission because of a 1 inch size of tires. Dealerships sell trucks with bigger wheels and custom accessories and still honor their warranty. But, for some reason if it isn't a basic bottom of the line vehicle with absolutely no modifications they will not honor their warranty. They will cancel then say, "We can write a new policy," that is going to exclude anything to do with the part they canceled on you for. So essentially you pay for a warranty that doesn't honor any breakdowns. When it was being written they asked if the wheels wasn't stock and it wasn't a issue when they wanted the money. But, as soon as a system failure happens they will look for any excuse to not fix and blame you."[54]

s. On October 3, 2024, a consumer wrote: "I work at a dealership and called a waterpump replacement and was DENIED due to it being a wearable item? All parts wear out! Never have I had a extended warranty decline a waterpump. The adjuster tried everything trick to decline it. I told the customer to get rid of that lousy scam contract asap."[55]

t. On October 2, 2024, a consumer wrote: "Buyer beware. Have a vehicle in the shop for transmission issues. Just found out Endurance won't cover a single penny. The truck has a 1-2" lift with slightly larger tires than factory. I disclosed all this when they sold me my plan. Endurance knew they wouldn't cover and sold to me anyways. I've seen some shady stuff but this takes the cake. Next call will be to the Oklahoma Insurance Commission."[56]

u. On October 1, 2024, a consumer wrote: "Buyer beware!!! This company is a misleading company for warranty coverage. Make sure you get your contract before you agree to a verbile over the phone they will take your money then send you your contract!!! Their sales team is a "yes, yes, yes you're covered"!!! My wife and I before we purchased our vehicle that was still under a power train warranty that was almost up so I talked with ENDURANCE sales team and yes, yes, yes you're covered (I BOUGHT THE SUPREME PACKAGE)

---

[53] *See id.*
[54] *See id.*
[55] *See id.*
[56] *See id.*

So "EVERYTHING IS COVERED GUARANTEED". We buy the vehicle, my wife calls to confirm our warranty, she was told the same thing from a different sales rep "EVERYTHING IS COVERED GUARANTEED IN THE SUPREME PACKAGE" (and they recorded both conversations) so we sign up PAY THEM and we had to asked them to send us our contract. They send You a booklet and inside is terms that NO SALES REP SAYS anything about!!! 10 months later my wife's truck breaks down, we put it in a DEALERSHIP shop, I was informed this would not be covered under factory warranty. I explaind I got ENDURANCE SUPREME package, fix it. Endurance DENIED MY CLAIM AND HAD THEIR CANCELATION MANAGER explain that their cancelling my policy and "our team made a mistake" we will refund your money (we will see) SORRY THIS HAPPENED!! Now My wife's vehicle is in the shop with a $7,456.00 repair needed. This Company is a SHAM, JOKE, and a RIP OFF to the people. I wonder if DANICA PATRICK HAS THIS ISSUE OR IF SHE KNOW THE TRUTH ABOUT THE COMPANY SHE IS A SPOKESMAN FOR!!!!"[57]

v. On October 1, 2024, a consumer wrote: "I don't usually write a review but if this one can save a brother from this burglars, I'd be happy to write this one. Had been a customer on them for 2 months (unfortunately). Check engine light came on, took my car to the shop & finds out that I needed a new engine. Filed a claim, got DENIED 'cause they said that was an existing problem already. What a JOKE! They would do anything & everything for you to get denied filing a claim. Their customer service reps are trained crooks too 'cause they will make you buy their insurance to the best that they can but if you're in trouble, no one would help you. Even my mechanic & local body shops in my area said DO NOT make business with them 'cause they are by far one of the most HORRIBLE warranty companies to deal with."[58]

w. On October 1, 2024, a consumer wrote: "Prior to purchasing my contract, I asked what seemed like THOUSANDS of questions (especially being on a limited income) because I wanted to make sure that this was something that I could find the scarcely funds. Nevertheless dealing with a 2009 SUV the things that were important to me were supposed to be covered. The time comes when my SUV needs to be serviced, and basically next to nothing was covered "UNLESS" it was connected to something else that was in the contract, etc....Then as for the rental (smh), that portion in itself WAS/IS a DISASTER. There are limited areas and the policy is a ripoff....I'm supposed to tell the

---

[57] See id.
[58] See id.

TRUTH in this review, and that's what I did. I told "My TRUTH". I doubt they will even allow this to be posted. Blessings to ALL."[59]

x.  On October 1, 2024, a consumer wrote: "Needed an engine for my car and they did not cover it saying it was due to lack of maintenance. I brought in paperwork proving that my vehicle maintenance was kept up. Found metal in the oil. I paid $5762 out of pocket."[60]

y.  On September 30, 2024, a consumer wrote: "Very misleading. Told me they would cover my vehicle and gave every detail about my trucks, meeting the requirements of my policy. As soon as I had an issue with my truck, they tried not to find anything they could not to fix my truck and told me I needed a different policy for my truck that they tried to upsell me on but said they weren't going to cover anything now. They tell you what you want to hear and give you a peace of mind but it's just to get a sale."[61]

z.  On September 27, 2024, a consumer wrote: "Do not get this extended warranty. I been paying my extended warranty on my car for a year and now that need it they are only covering half of the repairs. Do not I repeat do not get scam by this people."[62]

aa. On September 26, 2024, a consumer wrote; "Endurance told my boyfriend, his heater core was covered. We drove the vehicle over 50 miles to their certified mechanic. They did a diagnostic, now Endurance says it's not covered. We wouldn't have taken the truck up, if it wasn't covered. We are out time, gas and cost of diagnostics. Not worth it for endurance."[63]

bb. On September 26, 2024, a consumer wrote; "I purchased this plan to cover full power train, cost was in total 6800$ 130$ per month. For a Ford Flex 2009 when my engine went, they pulled a limited liability clause that they will only cover up to trade-in value 3200$ out of a 8200$ repair, won't even pay the repair shop for tear down they requested, this company is a scam and Florida should be ashamed of themselves for allowing a company to operate in this manner."[64]

cc. On September 25, 2024, a consumer wrote: "Took car to Ford service for air conditioner repair. Problem found and fixed but Endurance denied

---

[59] *See id.*
[60] *See id.*
[61] *See id.*
[62] *See id.*
[63] *See id.*
[64] *See id.*

almost $400 diagnostic charge. How can you isolate problem without performing diagnostics? Ridiculous!"[65]

dd. On September 24, 2024, a consumer wrote: "This is the absolute worst insurance company ever!! I got this so-called insurance and then just 7 months later, my car broke down. The repair was going to be $8,000, but Endurance said they would only cover $2500 because that's what they think my car is worth! I was beyond mad about this but tried to accept it. So, I decided to cancel my contract since there was no way I could afford the $6000 I'd have to pay out of pocket. When I canceled, I had already paid them $900 in premiums and was told I would get it back. But when the refund came after two months, it was only $100! They refused to cover my repair fully and then basically stole my money. This company is ridiculous and just plain awful! They are literally stealing from people!!"[66]

ee. On September 24, 2024, a consumer wrote: "This place is a scam, I have a claim and they're doing everything in their power to not pay. They keep wanting me to come out of pocket for something they should cover, even their own inspector said the part needs to be replaced and they go against his word to find another reason to not honor their policy. Don't go here. #scam"[67]

ff. On September 21, 2024, a consumer wrote: "As of yesterday, I have paid my 12th month payment of $187 per month for a 24-month contract. Two weeks ago something happened with my car with check engine light on. Took to Nissan and mind you for almost 12 months I never used this warranty I was thinking only to be used when needed to save money on repair. My car has been in the shop for almost 2 weeks now, it was Wednesday last week the service advisor spoke to Endurance and was told the inspector will come max 48hrs which was Friday. Friday came, no one came. I waited the weekend day comes I called Endurance they guaranteed inspector will come that day. No one showed up. Tuesday I called again almost end of business hours they finally come. Took 4 business days before they showed up. Then another 48 hrs to get a report from claim department that they will not pay the $3700 turbo replacement and labor. The mechanic said he was told it's because seal on turbo was the main cause of the problem yet he pointed out that seal in the turbo has doesn't get replaced or fixed anyways the whole turbo has to be replaced no matter what. You just can't replace or fix the seal. I called Endurance and they said it's because of the seal. It is so crazy to think that they rip people that they know seal is the part they can easily break yet they will not pay for the whole

---

[65] *See id.*

[66] *See id.*

[67] *See id.*

42

damn thing for the turbo replacement that comes with a seal. If seal can be replaced or fixed on obviously it's an easy fix and less money and I don't need to call Endurance but they know how to scam people in little things that they can escape just to avoid paying $3700...in total I have paid $187 for 12 months for nothing. I cancelled my policy today. Save your money. Never trust any of this company."[68]

gg. On September 19, 2024, a consumer wrote: "I have a failed oil pump and they won't replace it. There's always a catch to these warranty companies. Only go through dealer-approved companies. This company may show high rating but when you get into a real problem they'll figure out a way to not pay for it or get out of it...."[69]

hh. On September 19, 2024, a consumer wrote: "Had overheating on Ram Truck. Took to certified shop they recommended. The submitted repair cost and Endurance turned down. Only willing to pay 1/3 of cost. Needed water pump and thermostat. Had to replace myself."[70]

147. As of the date of this Complaint, more than 1,700 consumers joined a public Facebook page to complain about Endurance's conduct:[71]



a. On November 28, 2024, a consumer wrote: "If you have a policy with them, I recommend highly that you go ahead and cancel it and get what you can. at the end of the day, they will not pay for big ticket items. they will find every loophole to get out of it. They're nothing but a ponzi scheme."[72]

b. On November 24, 2024, a consumer wrote: "Hey folks, I am in Florida, and they refused to fix my transmission because I had "exceeded my allowable

[68] *See id.*
[69] *See id.*
[70] *See id.*
[71] https://www.facebook.com/groups/997968297527414/ (last visited March 19, 2025).
[72] *See id.*

43

amount". This is something new to me, and now they won't even return my phone calls or emails. I guess I'll have to discuss this with an attorney here in my state. This company is a rip off. DON'T DO IT. I don't care what famous celebrity endorses them."[73]

c. On November 24, 2024, a consumer wrote: "2020 Chevrolet 1500 duramax high country. Denied the full claim. Replaced valve body then authorized for full tear down of transmission for inspection because it still wasn't shifting right. Discovered stripped gears and shifting. Endurance then denied claim, stating preexisting. Gm dealership fought, stating is a huge common issue atm and that there is no way of telling when the wear happened. In Maine if anyone has contacts for lawyers."[74]

d. On November 21, 2024, a consumer wrote: "Endurance does not pay claims its a bunch of people lying to not pay the claim very easy to take your monthly payments alot of small print not to Pay!"[75]

e. On November 20, 2024, a consumer wrote: "WELL, Endurance screwed me! Transmission went bad in 2019 truck. Endurance denied claim. Said it was Pre-existing!"[76]

f. On November 16, 2024, a consumer wrote: "I got a 2013 bmw 328 with 115,000 miles for my son and all maintenance been kept up to date according to car fax from previous owners and I bought the car from Grayson in Knoxville which has a bmw dealership and couple others for years. Drove car 2000 miles and no problems and no check engine lights, the car looks new inside and out and went to start the car and wouldn't start and jumped time and endurance denied the claim because oil sample came back high iron??"[77]

g. On November 12, 2024, a consumer wrote: "We are dealing with endurance now they have are claim for a week and no car to drive so they are going against their commercial they were supposed to give us a car to drive nothing yet we have called every day."[78]

h. On November 6, 2024, a consumer wrote: "These idiots denied my claim of a bad motor because my wheels are aftermarket."[79]

---

[73] *See id.*

[74] *See id.*

[75] *See id.*

[76] *See id.*

[77] *See id.*

[78] *See id.*

[79] *See id.*

i.  On October 29, 2024, a consumer wrote: "So I've had my extended warranty with endurance since July , they accepted my car which is a 2022 bmw m550, I was about to lose my manufacturer warranty at 50k miles so I purchased endurance to be safe , well last month I had to use my warranty , brought my car in for a check engine light , so after breaking the car down after having it a couple weeks the garage determined that it was a piston ring that went , they contacted endurance and endurance sent out a inspector to look at the engine that's been broken down to determine if it's a issue they cover . The inspector reported what he saw to endurance and endurance contacted the garage that has my car and told them they need to break down the engine even further to determine there's no carbon related issues with the breakdown because if it's carbon related they will not cover it , so after a couple more days of tearing down the engine and many more hours of labor at 200$ a hour they got everything broken down and determined it was a faulty piston which is covered by endurance , so they sent the inspector out AGAIN and he reported what he saw and reported it was not carbon related and that the warranty covers pistons and piston related issues , so 4.5 weeks now the garage has my car (because endurance would take days to get back to them so it took the process much longer than needed). So the garage and inspector determined the best solution was a used engine replacement so the bill is about 30,000$ , so endurance said on Friday (10/25) that they were having their vendors look for parts before they had the garage get them because they are trying to save money , so today (10/28) I get a call from endurance stating that my car DOES NOT QUALIFY for any coverage because it's listed as "exotic", this is after having a policy with them for 4 months , they had the garage further breakdown my engine resulting in thousands of more dollars in labor , they had a inspector out multiple times , and now all of a sudden they are concealing my policy and not covering anything , Has anyone had a experience like this? I've contacted a lawyer and plan on suing them . They have caused this whole process to drag out many more weeks then it should have , resulting me in paying 2000$+ for a rental car the whole time , thousands more in labor because they wanted further breakdown of the engine , the absolute worst experience I've ever had with a warranty company."[80]

j.  On October 22, 2024, a consumer wrote: "I bought the endurance plan a few months after I cought my 2018 Ford escape.  It had 98000 when I bought it in January 2024.  Starting around May 2024 it has been in the shop every other month.  First it was because their were issues with the car not starting (had to buy new battery....not covered and some electrical stuff also not covered.  I understand about the battery not being covered...but other electrical issues should have been covered).  A month later the air conditioner went out ($700 only $250 was covered by endurance).  Then there was a misfire happening (endurance didn't pay anything. $500 to fix). Now, I need a new engine, new cooling system, new radiator....$7200.  Endurance is paying NOTHING.  i pay

---

[80] *See id.*

endurance $165/month. They deny nearly everything. I'm sick to death of them. I'm about to just cancel them."[81]

k. On October 22, 2024, a consumer wrote: "I got Endurance because I fell for the commercials. Six months into it we had an engine sensor go out Endurance denied the claim. I paid $1,000 out of MY pocket. I canceled that day."[82]

l. On October 4, 2024, a consumer wrote: "Has anyone ever gotten written documentation of a claim or denial from them? I continue to ask and they refuse to send me anything! which i feel is illegal...."[83]

148.    Despite the thousands of complaints online, Endurance attempts to undermine consumer complaints by alleging – without any proof whatsoever – that online negative reviews are simply fake.[84] These efforts further evidence Endurance's false and deceptive marketing towards their consumers.

## CLASS ALLEGATIONS

149.    Plaintiffs bring this action, pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(2), and/or 23(b)(3), on behalf of themselves and the following proposed classes:

**Nationwide Class:**
All persons in the United States who purchased a Vehicle Service Contract through Defendants.

**State Sub-Classes:**
All persons of the Nationwide Class who are residents of the states of Michigan, New Jersey, Ohio, Pennsylvania, and Texas and purchased a Vehicle Service Contract through Defendants in one of the aforementioned states shall be a member of a state Sub-Class.

Collectively, unless otherwise indicated, the class(es) are referred to herein as the "Class."

Excluded from the Class(es) are: (a) Defendants; (b) Defendants' affiliates, agents, employees,

---

[81] *See id.*
[82] *See id.*
[83] *See id.*
[84] https://www.endurancewarranty.com/learning-center/endurance-info/endurance-warranty-complaints-fake-reviews/ (last visited March 19, 2025).

officers and directors; and (c) the judge assigned to this matter, the judge's staff, and any member of the judge's immediate family. Plaintiffs reserve the right to modify, change, or expand the various class definitions set forth above based on discovery and further investigation.

150.  **Numerosity**: Upon information and belief, the Class is so numerous that joinder of all members is impracticable. While the exact number and identity of individual members of the Class are unknown at this time, such information being in the sole possession of Defendants and obtainable by Plaintiffs only through the discovery process, Plaintiffs believe, and on that basis allege, that the Class consists of over two million consumers.[85] The number and identity of Class members can be determined based on Defendants' records.

151.  **Commonality**: Common questions of law and fact exist as to all members of each Class. These questions predominate over questions affecting individual Class members. These common legal and factual questions include, but are not limited to:

a.      Whether Defendants breached their contracts with Plaintiffs and the Class;

b.      Whether Defendants have been unjustly enriched by Plaintiffs and the Class;

c.      Whether Defendants knowingly misled Plaintiffs and the Class;

d.      Whether Defendants violated the Michigan Consumer Protection Act;

e.      Whether Defendants violated the New Jersey Consumer Fraud Act;

f.      Whether Defendants violated the Ohio Consumer Sales Practices Act; and

g.      Whether Defendants violated the Pennsylvania Unfair Trade Practices and Consumer Protection Law.

---

[85] https://carshield.com/why-carshield/our-company/#:~:text=CarShield%20administrators%20get%20your%20vehicle,protecting%20over%20two%20million%20vehicles (last visited March 17, 2025).

152. **Typicality**: Plaintiffs have the same interest in this matter as all Class members, and Plaintiffs' claims arise out of the same set of facts and conduct as the claims of all Class members. Plaintiffs and Class members' claims all arise out of Defendants' uniform conduct and statements.

153. **Adequacy**: Plaintiffs have no interest that conflicts with the interests of the Class, and are committed to pursuing this action vigorously. Plaintiffs have retained counsel competent and experienced in complex consumer class action litigation. Accordingly, Plaintiffs and their counsel will fairly and adequately protect the interests of the Class.

154. **Superiority**: A class action is superior to all other available means of fair and efficient adjudication of the claims of Plaintiffs and members of the Class. The injury suffered by each individual Class member is relatively small compared to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendants' conduct. It would be virtually impossible for members of the Class individually to effectively redress the wrongs done to them. Even if the members of the Class could afford such individual litigation, the court system could not. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of this case. Individualized rulings and judgments could result in inconsistent relief for similarly situated individuals. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION
### COUNT I
### BREACH OF CONTRACT
#### (on behalf of Plaintiffs and the Class)

155.   Plaintiffs incorporate by reference each of the allegations contained in the foregoing paragraphs of this Complaint.

156.   Plaintiffs and the Class members entered into a contract with Defendants when they purchased Vehicle Service Contracts.

157.   The contract required that Defendants timely process claims for coverage and approve claims for covered repairs.

158.   Defendants' obligations under the contract were intended to benefit Plaintiffs and the Class members.

159.   Plaintiffs and the Class members reasonably relied on Defendants' ability to perform according to their obligations when they purchased Vehicle Service Contracts.

160.   Defendants' obligations were material to Plaintiffs' and the Class members' decisions to purchase Vehicle Service Contracts because a reasonable person would have considered them to be important in deciding whether to enter into such agreements.

161.   Plaintiffs and the Class members paid monthly premiums to Defendants in order to obtain the coverage guaranteed under the contract.

162.   Defendants breached their contracts with Plaintiffs and the Class when they failed to timely process claims and/or cover repairs under the Vehicle Service Contract by denying claims.

163.   Defendants' breach of the contract directly injured Plaintiffs and the Class members, who were forced to pay out of pocket for necessary repairs that they expected, and were promised, would be covered under their Vehicle Service Contracts.

164. Plaintiffs and the Class members paid monthly premiums and complied with all other obligations under the contract but did not receive the promised benefits in return.

165. As a direct and proximate result of Defendants' conduct, Plaintiffs and Class members have been injured and sustained damages.

## COUNT II
### UNJUST ENRICHMENT
#### (on behalf of Plaintiffs and the Class)

166. Plaintiffs incorporate by reference each of the allegations contained in the foregoing paragraphs of this Complaint.

167. This claim is brought in the alternative to Plaintiffs' contract-based claims.

168. Plaintiffs and the Class members paid monies to Defendants.

169. Defendants knowingly and willingly accepted and appreciated these benefits.

170. Defendants' retention of these benefits would be inequitable because Defendants obtained benefits to the detriment of Plaintiffs and the Class members.

171. As a direct and proximate result of Defendants' conduct, Plaintiffs and Class members have been injured and sustained damages.

## COUNT III
### FRAUDULENT CONCEALMENT
#### (on behalf of Plaintiffs and the Class)

172. Plaintiffs incorporate by reference each of the allegations contained in the foregoing paragraphs of this Complaint.

173. Defendants made material misrepresentations and omissions concerning a presently existing or past fact in violation of the common law. Defendants did not fully and truthfully disclose to customers the true nature of the coverage under the Vehicle Service Contracts or the

timeliness upon which Defendants would render decisions pursuant to the Vehicle Service Contracts.

174.    A reasonable consumer could not have discovered these material facts prior to purchasing a Vehicle Service Contract.

175.    Defendants made these material misrepresentations and omissions with knowledge of their falsity and with the intent that Plaintiffs and Class members rely upon them.

176.    The facts concealed, suppressed, and not disclosed by Defendants to Plaintiffs and Class members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase a Vehicle Service Contract.

177.    Defendants had a duty to disclose the true facts about the Vehicle Service Contracts and the process by which coverage is determined under them because:

    a.    the knowledge of the Vehicle Service Contracts and their details were known and/or accessible only to Defendants;

    b.    Defendants had superior knowledge and access to the relevant facts; and

    c.    Defendants knew the facts were not known to, or reasonably discoverable by, Plaintiffs and Class members.

178.    Defendants also had a duty to disclose because it made many affirmative representations about the Vehicle Service Contracts, including references as to coverage, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual terms of the Vehicle Service Contracts.

179.    Had Plaintiffs and the Class known about the true nature of the Vehicle Service Contracts, they would not have purchased a Vehicle Service Contract or would have paid less in

doing so. Thus, Plaintiffs and the other Class members were fraudulently induced to purchase Vehicle Service Contracts.

180.    Plaintiffs and Class members reasonably relied on Defendants' material misrepresentations and omissions and suffered damages as a result. Defendants' conduct was willful, wanton, oppressive, reprehensible, and malicious. Consequently, Plaintiffs and Class members are entitled to an award of punitive damages.

**COUNT IV**
**COMMON LAW FRAUD**
**(on behalf of Plaintiffs and the Class)**

181.    Plaintiffs incorporate by reference each of the allegations contained in the foregoing paragraphs of this Complaint.

182.    Defendants advertised, marketed, and sold Vehicle Service Contracts.

183.    Defendants marketed that their Vehicle Service Contracts provided comprehensive coverage and peace of mind and protection from repair bills.

184.    Defendants sold Vehicle Service Contracts with the knowledge that Defendants would not provide said coverage.

185.    Defendants intended that Plaintiffs and the Class members rely on these material misrepresentations and omissions when purchasing Vehicle Service Contracts.

186.    Defendants induced Plaintiffs and the Class members to purchase Vehicle Service Contracts with the knowledge that they would not provide coverage thereunder.

187.    The facts misrepresented, concealed, and omitted by Defendants were material to Plaintiffs' and the Class members' decisions to purchase Vehicle Service Contracts because a reasonable person would have considered them to be important in deciding whether to enter into such agreements.

188.     Defendants knew or should have known that the facts misrepresented, concealed, and omitted were material to Plaintiffs and the Class members.

189.     Defendants had a duty to inform Plaintiffs and the Class members that it would not offer coverage because Defendants had superior knowledge of the coverage, and Plaintiffs and the Class members could not have reasonably been expected to discover the extent of the coverage through reasonable diligence before purchasing Vehicle Service Contracts.

190.     Plaintiffs and the Class members reasonably relied on Defendants' ability to perform according to their obligations when they purchased Vehicle Service Contracts.

191.     Defendants' misrepresentations and omissions directly injured Plaintiffs and the Class members, who were forced to pay out of pocket for necessary repairs that they expected, and were promised, would be covered under their Vehicle Service Contracts, forced to continue making monthly payments on their Vehicle Service Contracts during the pendency of their claim for coverage, and were forced to incur out-of-pocket expenses associated with Defendants' undue delay in rendering decisions on claims for coverage.

192.     Plaintiffs and the Class members paid monthly premiums and provided Defendants with other benefits, but did not receive the promised benefits in return.

193.     Had Plaintiffs and the Class members known of the facts misrepresented, concealed, and omitted by Defendants, they would not have purchased Vehicle Service Contracts, or would have paid substantially less for them.

**COUNT V**
**NEGLIGENT MISREPRESENTATION**
**(on behalf of Plaintiffs and the Class)**

194.     Plaintiffs incorporate by reference each of the allegations contained in the foregoing paragraphs of this Complaint.

195. Plaintiffs bring this cause of action on behalf of themselves and the Class against all Defendants.

196. Defendants had or undertook a duty to disclose the Vehicle Service Contract truthfully and accurately.

197. Defendants had a duty to exercise reasonable care in making representations and/or statements concerning the Vehicle Service Contracts and the process by which coverage thereunder is decided.

198. Defendants breached their duty and failed to exercise reasonable care when they misrepresented the true nature of the process and coverage under the Vehicle Service Contracts. Specifically, Defendants misrepresented and failed to disclose to Plaintiffs and the Class that they would not timely process claims for coverage under the Vehicle Service Contracts and that the Vehicle Service Contracts did not cover repairs, despite Defendants' statements to the contrary.

199. Defendants knew or should have known that their statements and/or omissions alleged herein were materially false and/or misleading.

200. Defendants' misrepresentations were material in that Plaintiffs and the Class believed the misrepresentations to be important in making their decision to purchase Vehicle Service Contracts.

201. Defendants knew or should have known that their misrepresentations would induce Plaintiffs and the Class to purchase a Vehicle Service Contract from Defendants and pay premiums under the Vehicle Service Contract.

202. But for Defendants' misrepresentations, Plaintiffs and the Class would not have purchased Vehicle Service Contracts from Defendants or would have paid substantially less to do so.

203.     Plaintiffs and the Class reasonably relied on Defendants' misrepresentations and, as a direct and proximate result of Defendants' conduct, Plaintiffs and the Class suffered damages.

## COUNT VI
## PROMISSORY ESTOPPEL
### (on behalf of Plaintiffs and the Class)

204.     Plaintiffs incorporate by reference each of the allegations contained in the foregoing paragraphs of this Complaint.

205.     Defendants promised to provide coverage pursuant to Vehicle Service Contracts.

206.     Plaintiffs and the Class reasonably relied upon Defendants' promises to their detriment when they purchased their Vehicle Service Contracts.

207.     Plaintiffs and the Class demand that Defendants honor their contractual obligations with them.

208.     Plaintiffs notified Defendants of these alleged violations by letter dated October 9, 2024.

## COUNT VII
## VIOLATIONS OF THE MICHIGAN CONSUMER PROTECTION ACT
## Mich. Comp. Laws §§ 445.901, *et seq.*
### (on behalf of Plaintiff Kujawa and the Michigan Sub-Class)

209.     Plaintiffs incorporate by reference each of the allegations contained in the foregoing paragraphs of this Complaint.

210.     Plaintiff Kujawa brings this cause of action individually and on behalf of the members of the Michigan Sub-Class.

211.     Defendants are "persons" as defined by the Michigan Consumer Protection Act, Mich. Comp. Laws § 445.902.

212.     Defendants' sale of Vehicle Service Contracts is considered "trade or commerce" as defined by Mich. Comp. Laws § 445.902.

213.     The Michigan Consumer Protection Act broadly prohibits unfair, unconscionable, or deceptive methods, acts, or practices. Specifically, and without limitation of the broad prohibition, the Act prohibits Defendants from the following acts:

a.   Causing a probability of confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services, in violation of Mich. Comp. Laws § 445.903(1)(a);

b.   Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have…, in violation of Mich. Comp. Laws § 445.903(1)(c);

c.   Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another, in violation of Mich. Comp. Laws § 445.903(1)(e);

d.   Disparaging the goods, services, business, or reputation of another by false or misleading representation of fact, in violation of Mich. Comp. Laws § 445.903(1)(f);

e.   Advertising or representing goods or services with intent not to dispose of those goods or services as advertised or represented, in violation of Mich. Comp. Laws § 445.903(1)(g);

f.   Representing that a part, replacement, or repair service is needed when it is not, in violation of Mich. Comp. Laws § 445.903(1)(j);

g.   Causing a probability of confusion or of misunderstanding as to the legal rights, obligations, or remedies of a party to a transaction, in violation of Mich. Comp. Laws § 445.903(1)(n);

h.  Representing or implying that the subject of a consumer transaction will be provided promptly, or at a specified time, or within a reasonable time, if the merchant knows or has reason to know it will not be so provided, in violation of Mich. Comp. Laws § 445.903(1)(q);

i.  Failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer, in violation of Mich. Comp. Laws § 445.903(1)(s);

j.  Entering into a consumer transaction in which the consumer waives or purports to waive a right, benefit, or immunity provided by law, unless the waiver is clearly stated and the consumer has specifically consented to it, in violation of Mich. Comp. Laws § 445.903(1)(t);

k.  Failing, in a consumer transaction that is rescinded, canceled, or otherwise terminated in accordance with the terms of an agreement, advertisement, representation, or provision of law, to promptly restore to the person or persons entitled to it a deposit, down payment, or other payment, or in the case of property traded in but not available, the greater of the agreed value or the fair market value of the property, or to cancel within a specified time or an otherwise reasonable time an acquired security interest, in violation of Mich. Comp. Laws § 445.903(1)(u);

l.  Gross discrepancies between the oral representations of the seller and the written agreement covering the same transaction or failure of the other party to the transaction to provide the promised benefits, in violation of Mich. Comp. Laws § 445.903(1)(y);

m. Charging the consumer a price that is grossly in excess of the price at which similar property or services are sold, in violation of Mich. Comp. Laws § 445.903(1)(z);

n. Causing coercion and duress as the result of the time and nature of a sales presentation, in violation of Mich. Comp. Laws § 445.903(1)(aa);

o. Making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is, in violation of Mich. Comp. Laws § 445.903(1)(bb); and

p. Failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner, in violation of Mich. Comp. Laws § 445.903(1)(cc).

214. Defendants' conduct as alleged above and below constitutes unfair, unconscionable, or deceptive methods, acts, or practices in violation of Mich. Comp. Laws § 445.903. By concealing and failing to fully and truthfully disclose to customers the true nature of the coverage under the Vehicle Service Contracts or the timeliness upon which Defendants would render decisions pursuant to the Vehicle Service Contracts, Defendants participated in unconscionable acts and practices that violated the Michigan Consumer Protection Act.

215. Additionally, by advertising and marketing their Vehicle Service Contracts as providing complete coverage, and by presenting themselves as the country's most reliable and reputable vehicle service contract dealer, Endurance knowingly and intentionally misrepresented and omitted material facts in connection with the sale of their Vehicle Service Contracts.

Defendants systematically misrepresented, suppressed, or omitted material facts related to their Vehicle Service Contracts in the course of their business.

216.    Defendants further violated the Michigan Consumer Protection Act by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with the intent that others rely upon such concealment, suppression or omission, in connection with the sale of their Vehicle Service Contracts.

217.    Defendants' unfair and deceptive acts or practices occurred repeatedly in Defendants' trade or commerce, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

218.    Defendants knew or should have known that their conduct violated the Michigan Consumer Protection Act.

219.    Plaintiff Kujawa and the Michigan Sub-Class Members reasonably relied on Defendants' misrepresentations and omissions of material facts in their advertisements of and in the purchase of their Vehicle Service Contracts.

220.    Had Plaintiff Kujawa and the Michigan Sub-Class Members known that their Vehicle Service Contracts would not provide the coverage promised under their contracts, they would not have purchased them, or would have paid less for them. Plaintiffs did not receive the benefit of their bargain as a result of Defendants' misconduct.

221.    Defendants owed Michigan Plaintiff and the Michigan Sub-Class Members a duty to disclose the truth about the Vehicle Service Contracts because Defendants: (a) possessed exclusive knowledge of the true nature of coverage under the Vehicle Service Contracts; (b) intentionally concealed the foregoing from Plaintiff Kujawa and the Michigan Sub-Class Members; and/or (c) made incomplete representations regarding the quality of coverage under the

Vehicle Service Contracts while purposefully withholding material facts from Plaintiff Kujawa and the Michigan Sub-Class Members that contradicted these representations.

222.     Due to Defendants' specific and superior knowledge that they would not provide coverage under the Vehicle Service Contracts, their false representations regarding the scope and timeliness of coverage under the Vehicle Service Contracts, and reliance by Plaintiff Kujawa and the Michigan Sub-Class Members on these material representations, Defendants had a duty to disclose to Class members of the true nature of the scope of coverage, timeliness of the claims process, limitations of coverage and Defendants' liability, and that Plaintiff Kujawa and Michigan Sub-Class Members would be required to bear the cost of repairs to their vehicles as well as other expenses while waiting for their claims to be reviewed. Having volunteered to provide information to Plaintiff Kujawa and the Michigan Sub-Class Members, Defendants had the duty to disclose not just the partial truth, but the entire truth.

223.     These omitted and concealed facts were material because they directly impact the value of the Vehicle Service Contracts purchased by Plaintiff Kujawa and the Michigan Sub-Class Members. Comprehensive coverage and timely coverage are material concerns to consumers. Defendants represented to Plaintiff Kujawa and the Michigan Sub-Class Members that they were purchasing Vehicle Service Contracts that provided vast, comprehensive, full coverage, and that claims for coverage thereunder were simple, timely, and easy, as alleged in this Complaint, when in fact Defendants do not render decisions in a timely manner and/or deny otherwise covered claims.

224.     Plaintiff Kujawa and the Michigan Sub-Class Members suffered injury in fact to a legally protected interest. As a result of Defendants' conduct, Plaintiff Kujawa and the Michigan

Sub-Class Members were harmed and suffered actual damages in the form of the diminished value of their Vehicle Service Contracts.

225. As a result of Defendants' conduct, Plaintiff Kujawa and the Michigan Sub-Class Members were harmed and suffered actual damages as a result of Defendants' misrepresentations and omissions with regard to their Vehicle Service Contracts they purchased which do not provide the promised coverage.

226. As a direct and proximate result of Defendants' unfair or deceptive acts or practices, Plaintiff Kujawa and the Michigan Sub-Class Members suffered and will continue to suffer injury in fact and/or actual damages.

227. Defendants' violations present a continuing risk to Plaintiff Kujawa and the Michigan Sub-Class Members as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

228. Plaintiffs seek actual damages, plus an amount not exceeding $5,000 in noneconomic damages, an order enjoining Defendants' deceptive and unfair conduct, court costs and attorneys' fees as a result of Defendants' violations of the Michigan Consumer Protection Act as provided in Mich. Comp. Laws § 445.911.

## COUNT VIII
### VIOLATIONS OF THE NEW JERSEY CONSUMER FRAUD ACT
### N.J. Stat. Ann. §§ 56:8-1, *et seq.*
### (on behalf of Plaintiff Wilder and the New Jersey Sub-Class)

229. Plaintiffs incorporate by reference each of the allegations contained in the foregoing paragraphs of this Complaint.

230. Plaintiff Wilder brings this claim individually and on behalf of the New Jersey Sub-Class against Defendants.

231. The New Jersey Consumer Fraud Act, N.J. Stat. Ann. §§ 56:8-1, *et seq.* ("NJCFA") protects consumers against "any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise . . . ." N.J. Stat. Ann. § 56:8-2.

232. Plaintiff Wilder and the New Jersey Sub-Class Members are consumers who purchased Vehicle Service Contracts.

233. In the course of Defendants' business, they knowingly concealed, suppressed, and omitted material facts regarding the coverage under the Vehicle Service Contracts or the timeliness upon which Defendants would render decisions pursuant to the Vehicle Service Contracts, by advertising and marketing their Vehicle Service Contracts as providing complete coverage, and by presenting themselves as the country's most reliable and reputable vehicle service contract dealer. Further, Defendants employed deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with the intent that others rely upon such concealment, suppression or omission, in connection with the sale of their Vehicle Service Contracts.

234. Defendants' conduct was done with the intent that Plaintiff Wilder and the New Jersey Sub-Class Members rely upon that concealment, suppression, and omission when making their purchasing decisions.

235. The facts about the nature of the Vehicle Service Contracts, particularly the true nature of coverage thereunder, are material because they directly impact the value of the Vehicle Service Contracts and their purported benefits.

236. Defendants have engaged in unfair and deceptive trade practices, including:

    a.   representing that the Vehicle Service Contracts have characteristics, uses, benefits, and qualities which they do not have;

    b.   representing that the Vehicle Service Contracts are of a particular standard and quality when they are not;

    c.   advertising the Vehicle Service Contracts with the intent to not sell them as advertised; and

    d.   otherwise engaging in conduct likely to deceive.

237.    Defendants' actions as set forth above occurred in the conduct of trade or commerce.

238.    Defendants' conduct caused Plaintiff Wilder and the New Jersey Sub-Class Members to suffer an ascertainable loss. Plaintiff Wilder and the other New Jersey Sub-Class Members purchased Vehicle Service Contracts they otherwise would not have, overpaid for their Vehicle Service Contracts, and did not receive the benefit of their bargain. Plaintiff Wilder and the New Jersey Sub-Class Members have also incurred and will continue to incur costs for necessary repairs to their vehicles as a result of the Defendants' refusal to provide coverage for repairs under the Vehicle Service Contracts.

239.    Plaintiff Wilder's and other New Jersey Sub-Class Members' damages are the direct and foreseeable result of Defendants' unlawful conduct. Had the true facts of coverage and timeliness of coverage of Vehicle Service Contracts been disclosed, consumers would not have purchased or would have paid less for them and would have been spared the subsequent expenses described herein.

240.    Pursuant to N.J. Stat. Ann. § 56:8-20, the New Jersey Attorney General will be served with a copy of this Complaint.

<u>COUNT IX</u>
**VIOLATIONS OF THE OHIO CONSUMER SALES PRACTICES ACT**
**Ohio Rev. Code Ann. §§ 1345.01, *et seq.***
**(on behalf of Plaintiff Cooper and the Ohio Sub-Class)**

241.     Plaintiffs incorporate by reference each of the allegations contained in the foregoing paragraphs of this Complaint.

242.     Plaintiff Cooper brings this cause of action individually and on behalf of the members of the Ohio Sub-Class.

243.     Plaintiff Cooper and the Ohio Sub-Class Members are "consumers" as defined by the Ohio Consumer Sales Practices Act, Ohio Rev. Code Ann. § 1345.01 ("Ohio CSPA").

244.     Defendants are "suppliers" as defined by the Ohio CSPA.

245.     Plaintiff Cooper and the Ohio Sub-Class Members' purchases of Vehicle Service Contracts were "consumer transactions" as defined by the Ohio CSPA.

246.     The Ohio CSPA, Ohio Rev. Code Ann. § 1345.02, broadly prohibits "an unconscionable act or practice in connection with a consumer transaction." Specifically, and without limitation of the broad prohibition, the Act prohibits suppliers from representing:

   a.  That the subject of a consumer transaction has sponsorship, approval, performance characteristics, accessories, uses, or benefits that it does not have;

   b.  That the subject of a consumer transaction is of a particular standard, quality, grade, style, prescription, or model, if it is not;

   c.  That the subject of a consumer transaction has been supplied in accordance with a previous representation, if it has not, except that the act of a supplier in furnishing similar merchandise of equal or greater value as a good faith substitute does not violate this section; and

      d.   That the subject of a consumer transaction will be supplied in greater quantity than the supplier intends.

Ohio Rev. Code Ann. § 1345.02.

247.    The CSPA also prohibits suppliers from advertising goods with the intent not to sell them as advertised and engaging in acts or practices that are otherwise unfair, misleading, false, or deceptive to consumers. *Id.*

248.    Defendants' conduct as alleged above and below constitutes unfair and unconscionable acts or practices in consumer sales transactions in violation of Ohio Rev. Code Ann. § 1345.02. By concealing and failing to fully and truthfully disclose to customers the true nature of the coverage under the Vehicle Service Contracts or the timeliness upon which Defendants would render decisions pursuant to the Vehicle Service Contracts, Defendants participated in unconscionable acts and practices that violated the Ohio CSPA.

249.    Endurance participated in misleading, false, or deceptive acts that violated the Ohio CSPA as described below and alleged throughout the Complaint. By failing to disclose the true nature of the coverage under the Vehicle Service Contracts or the timeliness upon which Defendants would render decisions pursuant to the Vehicle Service Contracts, by advertising and marketing their Vehicle Service Contracts as providing complete coverage, and by presenting themselves as the country's most reliable and reputable vehicle service contract dealer, Endurance knowingly and intentionally misrepresented and omitted material facts in connection with the sale of their Vehicle Service Contracts. Defendants systematically misrepresented, suppressed, or omitted material facts related to their Vehicle Service Contracts in the course of their business.

250.    Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of

any material fact with the intent that others rely upon such concealment, suppression or omission, in connection with the sale of their Vehicle Service Contracts.

251.    Defendants' unfair and deceptive acts or practices occurred repeatedly in Defendants' trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

252.    Defendants knew or should have known that their conduct violated the Ohio CSPA.

253.    Plaintiff Cooper and the Ohio Sub-Class Members reasonably relied on Defendants' misrepresentations and omissions of material facts in their advertisements of and in the purchase of their Vehicle Service Contracts.

254.    Had Plaintiff Cooper and the Ohio Sub-Class Members known that their Vehicle Service Contracts would not provide the coverage promised under their contracts, they would not have purchased them, or would have paid less for them. Plaintiffs did not receive the benefit of their bargain as a result of Defendants' misconduct.

255.    Defendants owed Ohio Plaintiff and the Ohio Sub-Class Members a duty to disclose the truth about the Vehicle Service Contracts because Defendants: (a) possessed exclusive knowledge of the true nature of coverage under the Vehicle Service Contracts; (b) intentionally concealed the foregoing from Plaintiff Cooper and the Ohio Sub-Class Members; and/or (c) made incomplete representations regarding the quality of coverage under the Vehicle Service Contracts while purposefully withholding material facts from Plaintiff Cooper and the Ohio Sub-Class Members that contradicted these representations.

256.    Due to Defendants' specific and superior knowledge that they would not provide coverage under the Vehicle Service Contracts, their false representations regarding the scope and timeliness of coverage under the Vehicle Service Contracts, and reliance by Plaintiff Cooper and

the Ohio Sub-Class Members on these material representations, Defendants had a duty to disclose to Class members the true nature of the scope of coverage, timeliness of the claims process, limitations of coverage and Defendants' liability, and that Plaintiff Cooper and Ohio Sub-Class Members would be required to bear the cost of repairs to their vehicles as well as other expenses while waiting for their claims to be reviewed. Having volunteered to provide information to Plaintiff Cooper and the Ohio Sub-Class Members, Defendants had the duty to disclose not just the partial truth, but the entire truth.

257.    These omitted and concealed facts were material because they directly impact the value of the Vehicle Service Contracts purchased by Plaintiff Cooper and the Ohio Sub-Class Members. Comprehensive coverage and timely coverage are material concerns to consumers. Defendants represented to Plaintiff Cooper and the Ohio Sub-Class Members that they were purchasing Vehicle Service Contracts that provided vast, comprehensive, full coverage, and that claims for coverage thereunder were simple, timely, and easy, as alleged in this Complaint, when in fact Defendants do not render decisions in a timely manner and/or deny otherwise covered claims.

258.    Plaintiff Cooper and the Ohio Sub-Class Members suffered injury in fact to a legally protected interest. As a result of Defendants' conduct, Plaintiff Cooper and the Ohio Sub-Class Members were harmed and suffered actual damages in the form of the diminished value of their Vehicle Service Contracts.

259.    As a result of Defendants' conduct, Plaintiff Cooper and the Ohio Sub-Class Members were harmed and suffered actual damages as a result of Defendants' misrepresentations and omissions with regard to their Vehicle Service Contracts they purchased which do not provide the promised coverage.

260.    As a direct and proximate result of Defendants' unfair or deceptive acts or practices, Plaintiff Cooper and the Ohio Sub-Class Members suffered and will continue to suffer injury in fact and/or actual damages.

261.    Defendants' violations present a continuing risk to Plaintiff Cooper and the Ohio Sub-Class Members as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

262.    Plaintiffs seek actual damages, plus an amount not exceeding $5,000 in noneconomic damages, an order enjoining Defendants' deceptive and unfair conduct, court costs and attorneys' fees as a result of Defendants' violations of the Ohio CSPA as provided in Ohio Rev. Code Ann. § 1345.09.

## COUNT X
### VIOLATIONS OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW
### 73 P.S. §§ 201, *et seq.*
### (on behalf of Plaintiff Rinella and the Pennsylvania Sub-Class)

263.    Plaintiffs incorporate by reference each of the allegations contained in the foregoing paragraphs of this Complaint.

264.    Plaintiff Rinella and Pennsylvania Sub-Class Members are "persons" pursuant to 73 P.S. § 201-2(2).

265.    The acts complained of herein were perpetrated by Defendants in the course of trade or commerce pursuant to § 201-2(3).

266.    Each of Plaintiffs' purchase of Vehicle Service Contracts was a "purchase" pursuant to § 201-9.2(a).

267.    The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL") prohibits unfair or deceptive acts or practices, including:

    a.   Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have (§ 201-2(4)(v));

    b.   Advertising goods or services with intent not to sell them as advertised (§ 201-2(4)(ix));

    c.   Making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions (§ 201-2(4)(xi)); and

    d.   Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding (§ 201-2(4)(xxi)).

268.    Defendants engaged in unlawful trade practices, and unfair or deceptive acts or practices that violated the UTPCPL by misrepresenting and omitting that it would not timely process claims for coverage and/or deny claims for coverage. Thus, Defendants made written misrepresentations and omissions concealing their Vehicle Service Contracts. Defendants knew or should have known that the information they provided to Plaintiffs and the Pennsylvania Sub-Class contained inaccurate and misleading information but did nothing to correct those statements.

269.    In light of the allegations in the preceding paragraphs, Defendants engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, concealment, suppression or omission of any material fact with the intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Vehicle Service Contracts. Defendants' unfair and deceptive acts or practices alleged in the preceding paragraphs occurred repeatedly in Defendants' trade or business and were capable of deceiving a substantial portion of the purchasing public. Defendants knew the true nature of coverage under the Vehicle Service Contracts, yet concealed and misrepresented these material facts to Plaintiff Rinella and Pennsylvania Sub-Class Members both orally and in written

documents provided to Plaintiff Rinella and Pennsylvania Sub-Class Members at the time they contracted with Defendants.

270.    Plaintiff Rinella and Pennsylvania Sub-Class Members reasonably relied on Defendants' misrepresentations and omissions of material facts when deciding to purchase Vehicle Service Contracts. Had Plaintiff Rinella and Pennsylvania Sub-Class Members known that Defendants would not timely approve their claims for coverage and/or deny claims for coverage, they would have not purchased their Vehicle Service Contracts or would have paid less for them.

271.    Defendants owed Plaintiff Rinella and Pennsylvania Sub-Class Members a duty to disclose the truth about the pertinent details of their Vehicle Service Contracts because Defendants: (a) possessed exclusive knowledge of them; (b) intentionally concealed them from Plaintiff Rinella and the Pennsylvania Sub-Class; and/or (c) made incomplete representations regarding the coverage and/or services provided under the Vehicle Service Contracts.

272.    Plaintiff Rinella and Pennsylvania Sub-Class Members suffered injury in fact to a legally protected interest. As a result of Defendants' conduct, Plaintiff Rinella and the Pennsylvania Sub-Class were harmed and suffered actual damages in the form of: (a) being forced to pay for expensive vehicle repairs that should have been covered under the Vehicle Service Contract; (b) being forced to make monthly payments towards the Vehicle Service Contract; and (c) being forced to pay for additional out-of-pocket expenses while waiting for Defendants to render a decision on their claim for coverage.

273.    As a direct and proximate result of Defendants' unfair or deceptive acts or practices, Plaintiff Rinella and the Pennsylvania Sub-Class have suffered and will continue to suffer injury in fact and/or actual damages.

274.    Defendants' unlawful acts and practices complained of herein affect the public interest.

275.    Defendants are liable to Plaintiff Rinella and the Pennsylvania Sub-Class for their actual damages or $100, whichever is greater, and attorneys' fees and costs under 73 P.S. § 201-9.2(a). Plaintiff Rinella and the Pennsylvania Sub-Class are also entitled to an award of punitive damages given that Defendants' conduct was malicious, wanton, willful, oppressive, or exhibited a reckless indifference to the rights of others.

276.    Plaintiff Rinella notified Defendants of these alleged violations by letter dated October 9, 2024.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, respectfully request that this Court:

A.  Certify this action as a class action and appoint Plaintiffs to serve as class representatives and undersigned as class counsel;

B.  Award actual damages and equitable monetary relief to Plaintiffs and the Class;

C.  Award pre-judgment and post-judgment interest on such monetary relief;

D.  Grant appropriate injunctive and/or declaratory relief;

E.  Award reasonable attorneys' fees and costs; and

F.  Grant such further relief that this Court deems appropriate.

## JURY DEMAND

Plaintiffs, on behalf of themselves and the putative Class, demand a trial by jury on all issues so triable.

Dated: March 19, 2025

Respectfully submitted,

By: */s/ Elizabeth A. Fegan*
Elizabeth A. Fegan
**FEGAN SCOTT LLC**
150 S. Wacker Dr., 24th Floor
Chicago, IL 60606
Phone: 312.741.1019
Fax: 312.264.0100
beth@feganscott.com

Jonathan D. Lindenfeld (to be admitted *pro hac vice*)
**FEGAN SCOTT LLC**
305 Broadway, 7th Floor
New York, NY 10007
Phone: 332.216.2101
Fax: 312.264.0100
jonathan@feganscott.com

Joseph G. Sauder (to be admitted *pro hac vice*)
Matthew D. Schelkopf (to be admitted *pro hac vice*)
Joseph B. Kenney (to be admitted *pro hac vice*)
Juliette T. Kaestner (to be admitted *pro hac vice*)
**SAUDER SCHELKOPF LLC**
1109 Lancaster Avenue
Berwyn, PA 19312
Phone: (888) 711-9975
Fax: (610) 421-1326
jgs@sstriallawyers.com
mds@sstriallawyers.com
jbk@sstriallawyers.com
jtm@sstriallawyers.com

*Attorneys for Plaintiffs*