IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JESSICA COOPER, DANIEL KUJAWA, PHILIP   )
RINELLA, MELISSA RUMPF, and MATTHEW   )
WILDER, individually and on behalf of all others   )
similarly situated,   )
  )
           Plaintiffs,   )     Case No.   25 C 2919
  )
     v.   )
  )     Judge Robert W. Gettleman
ENDURANCE DEALER SERVICES, LLC, and   )
ENDURANCE WARRANTY SERVICES, LLC,   )
  )
           Defendants.   )

## MEMORANDUM OPINION AND ORDER

Defendants Endurance Dealer Services, LLC and Endurance Warranty Services, LLC (collectively, "Endurance") are Illinois companies that sell aftermarket warranty coverage for car repairs that are sold in what are called "Vehicle Service Contracts" or "VSCs." Plaintiffs are citizens of other states and, on behalf of themselves and a putative class of similarly situated people, have sued Endurance under 28 U.S.C. § 1332 of the Class Action Fairness Act. They allege that Endurance advertises that purchasers of its VSCs will "never pay for covered car repairs again." Based on representations like this, they bought VSCs from Endurance. But when plaintiffs submitted claims for needed repairs, Endurance sat on—and eventually denied—the claims. So, they conclude, Endurance tricked them into purchasing worthless VSCs.

Plaintiffs thus filed a complaint here and assert ten counts: breach of contract (on behalf of themselves and a Nationwide Class) (Count I); unjust enrichment (on behalf of themselves and a Nationwide Class) (Count II); fraudulent concealment (on behalf of themselves and a Nationwide Class) (Count III); common law fraud (on behalf of themselves and a Nationwide

Class) (Count IV); negligent misrepresentation (on behalf of themselves and a Nationwide Class) (Count V); promissory estoppel (on behalf of themselves and a Nationwide Class) (Count VI); violations of the Michigan Consumer Protection Act (on behalf of plaintiff Kujawa and the Michigan Sub-Class) (Count VII); violations of the New Jersey Consumer Fraud Act (on behalf of plaintiff Wilder and the New Jersey Sub-Class) (Count VIII); violations of the Ohio Consumer Sales Practices Act (on behalf of plaintiff Cooper and the Ohio Sub-Class) (Count IX); and violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law (on behalf of plaintiff Rinella and the Pennsylvania Sub-Class) (Count X).   In response, Endurance has moved to "compel arbitration and to dismiss the class action complaint."   Plaintiffs oppose. For the reasons below, the court grants in part and denies in part Endurance's motion.

## BACKGROUND

### FACTUAL BACKGROUND

Plaintiffs allege the following facts in their complaint.   Endurance sells VSCs—primarily through its website: EnduranceWarranty.com.   VSCs are "auto service agreements in which '[t]he contract seller agrees to perform (or pay for) certain repairs or services outlined in the contract.'"   (Citation omitted).   They are sold separately from the vehicle and typically provide coverage beyond the manufacturer's warranty.   Endurance touts itself as America's "Best Vehicle Protection Plan Provider," promises that customers will receive "complete coverage you can count on" (and that its protection plans are "the most comprehensive auto protection plans in the industry"), and advertises and markets that consumers will "never pay for covered car repairs again."   (Citation omitted).

2

But when consumers file claims for repairs under their VSCs, Endurance shirks its contractual obligations: it takes several weeks or months to render decisions on claims, and it denies coverage without any basis. Customers are thus left holding the bag—often losing the use of their vehicles while waiting for Endurance to render its decision, and paying out-of-pocket for repairs that Endurance promised would be covered.

Plaintiff Cooper, for example, paid roughly $4,500 for a VSC from Endurance for coverage on her Ford F-150. Endurance advertised that her plan would protect the transmission, and the VSC she purchased provided for comprehensive coverage for the transmission. Yet when Cooper—who reasonably relied on those representations—filed a claim for coverage to replace her transmission, Endurance delayed more than a month in rendering a decision and then denied her claim in full. As a result, Cooper lost the full use of her truck while waiting and incurred about $8,500 in out-of-pocket expenses. The other named plaintiffs endured similar experiences.

Endurance's "conduct amounts to false, deceptive, and misleading advertising in at least three ways." First, Endurance is "not the direct administrators for all of [its] contracts, despite claiming" that it is. Indeed, plaintiffs allege that "Endurance claims that being the direct administrator provides benefits to consumers, including expedited claims processes, more approved claims, and an overall more seamless experience." Yet "Endurance is **not** the direct administrator of all its contracts"—including for the contracts that plaintiffs Kujawa and Rumpf purchased. (Emphasis by plaintiffs).

Second, Endurance "promise[s] timely full coverage" but then "den[ies] covered claims." According to plaintiffs, Endurance makes many statements on its website that "promote

3

Endurance as the ultimate safeguard against unexpected vehicle repair costs"—using "slogans such as 'never pay for covered car repairs again,' 'complete coverage you can count on,' and 'reliable coverage that pays.'" (Citations omitted). Endurance further "emphasize[s] the simplicity of [its] process, promising a 'stress-free claims process' that takes as 'little as 48 hours,' and, in some cases, as little as just a few minutes." (Citations omitted). And it further "leverage[es] celebrity credibility" with celebrity endorsements, which "aim[ ] to instill trust and reliability in [its] services."

But ultimately, "Endurance's Vehicle Service Contracts do not live up to Endurance's advertisements and representations." "Rather than facilitating seamless claim resolutions, Endurance's methods create significant barriers for consumers attempting to secure coverage under their contracts." Endurance: subjects consumers to "frustrating and redundant procedures" and "often require[s] repair shops to perform superfluous labor after diagnosing the problem and recommending repairs"; denies claims based on "supposed pre-existing condition[s]" that, because Endurance requires nothing more that the vehicle's make, model, year, and mileage, "neither [Endurance] nor consumers . . . have knowledge of"; "refuses to cover the full cost of parts and/or labor"; and limits liability amounts.

Finally, Endurance "employ[s] scare tactics and other unfair and misleading conduct to induce contracts that do not offer the promised coverage." In particular, Endurance "sales representatives are directed to scare consumers that consumers' vehicles are prone to suffering from certain failures and that they will be subject to high-cost repair bills," and to "omit material information about coverage under the contract."

## PLAINTIFFS' CLASS ACTION CLAIMS

Given the scope of Endurance's alleged misrepresentations and actions, plaintiffs brought this case as a class action under Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3), proposing two classes:

> **Nationwide Class:** All persons in the United States who purchased a [VSC] through Defendants.

> **State Sub-Classes:** All persons of the Nationwide Class who are residents of the states of Michigan, New Jersey, Ohio, Pennsylvania, and Texas and purchased a [VSC] through Defendants in one of the aforementioned states shall be a member of a state Sub-Class.

According to plaintiffs: the Class is so numerous that joinder would be impracticable; common questions of law and fact predominate over individual issues; the claims are typical because they "all arise out of [Endurance]'s uniform conduct and statements"; plaintiffs have no conflicting interests with the class members and thus can adequately represent the classes; and a class action is superior to other avenues of litigation.

Plaintiffs assert ten counts. In Count I, plaintiffs allege a breach of contract: they and the class members entered into VSCs with Endurance, who failed to timely process claims or cover repairs as promised. This forced plaintiffs and the class members to pay out-of-pocket for repairs they expected to be covered, resulting in financial damages.

In Count II, plaintiffs bring "in the alternative to [their] contract-based claims" an unjust enrichment claim, alleging that plaintiffs paid Endurance for VSCs, but Endurance failed to provide the promised coverage. Retaining these payments without delivering benefits is inequitable, causing plaintiffs financial harm.

As for Count III, plaintiffs allege fraudulent concealment. Endurance knowingly misrepresented and concealed material facts about the true nature and timeliness of coverage under the VSCs, inducing plaintiffs to purchase them. This led to financial losses when claims were denied or delayed.

Count IV alleges common law fraud. According to plaintiffs, Endurance marketed its VSCs as comprehensive, knowing that it would not provide the promised coverage. This caused plaintiffs to incur out-of-pocket repair costs and other expenses.

In Count V, plaintiffs allege negligent misrepresentation based on Endurance misrepresenting the coverage and claims process under the VSCs and on Endurance failing to exercise reasonable care in their statements. Plaintiffs relied on these misrepresentations, resulting in financial damages from uncovered repairs.

Count VI alleges promissory estoppel: Endurance promised coverage under VSCs, which plaintiffs relied on to their detriment when they purchased them. Plaintiffs demand that Endurance honor its contractual obligations.

Lastly, plaintiffs allege in Counts VII through X violations of various state consumer protection laws based on Endurance's deceptive misrepresentations and omissions about its VSC's coverage and timeliness, which, plaintiffs allege, caused damages.

## **DISCUSSION**

Endurance has moved to compel Cooper, Rinella, Rumpf, and Wilder to arbitrate their claims, and to dismiss the complaint for failure to state a claim under Fed. R. Civ. P. 12(b)(6). The court begins with the motion to compel arbitration.

6

## <u>ARBITRATION</u>

The Federal Arbitration Act ("FAA") applies when written arbitration agreements involve interstate commerce.   9 U.S.C. § 2.   Under the FAA, arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."   Id.   The FAA thus "reflect[s] both a 'liberal federal policy favoring arbitration,' . . . and the 'fundamental principle that arbitration is a matter of contract.'"   AT&T Mobility LLC v. Concepcion, 563 U.S. 333, 339 (2011) (citations omitted).   Under the FAA, a party seeking to compel arbitration "must show three elements: (1) an enforceable written agreement to arbitrate; (2) a dispute within the scope of the arbitration agreement; and (3) a refusal to arbitrate."   Wallrich v. Samsung Elecs. Am., Inc., 106 F.4th 609, 617-18 (7th Cir. 2024).

Endurance argues here that Cooper's, Rinella's, Wilder's, and Rumpf's claims are subject to valid and enforceable arbitration agreements, that the claims here fall within the scope of those agreements, and that those individuals have refused to arbitrate.   In response, plaintiffs do not dispute that all four individuals have refused to arbitrate or that their claims, if subject to an enforceable agreement, fall within the scope of the agreements.   The issue here is thus whether there are valid and enforceable agreements in the first place.

### <u>Existence of an Enforceable Written Agreement to Arbitrate</u>

Although "the FAA does not provide the evidentiary standard applicable for determining whether to compel arbitration," the Seventh Circuit has "analogized the standard needed to that required at summary judgment."   Wallrich, 106 F.4th at 618.   To that end, "[t]he party seeking to compel arbitration bears the initial burden to show that an arbitration agreement exists."   Id.

If it does so, the party resisting arbitration bears the burden of identifying a triable issue of fact on the existence of the purported arbitration agreement.   See Tinder v. Pinkerton Sec., 305 F.3d 728, 735 (7th Cir. 2002).   "Like summary judgment, the court views the evidence in the light most favorable to the non-moving party and draws reasonable inferences in its favor."   Gilbert v. I.C. Sys., Inc., No. 19-CV-04988, 2021 WL 292852, at *2 (N.D. Ill. Jan. 28, 2021).   "When there are 'no factual disputes,' the district court decides the issue of whether an arbitration agreement exists 'as a matter of law.'"   Hamera v. Best Buy Co., 790 F. Supp. 3d 664, 666 (N.D. Ill. 2025) (quoting Domer v. Menard, Inc., 116 F.4th 686, 694 (7th Cir. 2024)); see also Scheurer v. Fromm Fam. Foods LLC, 863 F.3d 748, 751 (7th Cir. 2017) ("[a]rbitrability of a dispute is often a question of law that does not depend on undisputed facts").

Endurance argues that Rinella, Cooper, and Wilder each have a VSC with Endurance that obligates them to arbitrate their claims.   And Rinella and Cooper (along with Rumpf), Endurance contends, also agreed to arbitrate when they obtained a quote for a VSC through Endurance's website.   The court addresses each argument in turn.

### The Arbitration Clauses in Rinella's, Cooper's, and Wilder's VSCs

The issue of whether an arbitration agreement exists "is governed by state-law principles of contract formation."   Domer, 116 F.4th at 694.   But because that issue "calls for the application of general rules of contract formation," "the choice of law is not likely to affect the outcome."   Id.   Endurance assumes here that Illinois law applies in arguing that there is an enforceable agreement to arbitrate.   For their part, plaintiffs state that they "do not contest" that Illinois law applies.   The court therefore assumes for purposes of the motion to compel that Illinois law applies.   See Emplrs. Mut. Cas. Co. v. Skoutaris, 453 F.3d 915, 923 (7th Cir. 2006)

8

("As this case is brought under diversity jurisdiction, we apply the law of the forum state, Indiana, since neither party has challenged the district court's choice of law."); Johnson v. Uber Techs., Inc., No. 16 C 5468, 2017 WL 1155384, at *1 (N.D. Ill. Mar. 13, 2017) (when "the parties do not contend there is a difference between two states' laws, a court need not perform a choice-of-law analysis" and will apply "the law of the forum state").

      In Illinois—as "in virtually all jurisdictions"—contract formation "requires mutual assent." Sgouros v. TransUnion Corp., 817 F.3d 1029, 1034 (7th Cir. 2016). Endurance argues that Rinella, Cooper, and Wilder are trying to "enforce the VSC in this litigation, clearly indicating their understanding and belief that their respective contracts are valid," and that each VSC includes an arbitration provision. According to Endurance, Rinella's VSC states under the heading "ARBITRATION" that "[a]ny controversy or claim arising out of or relating to this Contract, or breach thereof, shall be settled by arbitration." (Quoting Rinella's VSC). And Cooper's and Wilder's contracts, Endurance contends, clearly "grant[ ] Endurance the contractual right to demand arbitration [on] 'any claim, complaint or demand' initiated by Cooper and Wilder 'relating to the Coverage provided under this Contract.'" (Quoting Cooper's and Wilder's VSC). The arbitration clauses in these three agreements, Endurance asserts, include "clear and unequivocal language that obligates those Plaintiffs to litigate their claims in arbitration." And although "the reservation of right to arbitrate belongs only to Endurance in Cooper and Wilder's VSCs," Endurance argues, "Illinois law does not require mutuality of arbitration agreements." (Citing Williams v. TCF Nat. Bank, No. 12 C 05115, 2013 WL 708123 (N.D. Ill. Feb. 26, 2013)).

9

In response, plaintiffs argue that the "arbitration clauses included in the VSCs are unconscionable and cannot be enforced." First, they assert, the clauses in Cooper's and Wilder's VSCs are "substantively unconscionable." That is for two independent reasons: (1) the "obligation to arbitrate is entirely one-sided" (cleaned up); and (2) the arbitration clause "grants Endurance the sole authority to select *any* method of adjudication (i.e., arbitration or mediation), *any* forum (the only vague limitation is that it is with a 'recognized' organization), and the applicable rules." (Emphasis by plaintiffs). And plaintiffs suggest that Endurance's case law on "mutuality" is distinguishable because those cases asked only whether the pertinent contracts were supported by consideration—not whether they were fair.

Second, plaintiffs assert that all three VSCs are "procedurally unconscionable." The reason for this, they argue, is straightforward: plaintiffs did not sign the VSCs; "Endurance never mentioned the arbitration provision when selling the VSCs"; Endurance "did not provide Plaintiffs with copies of the VSCs until they agreed to them by phone"; plaintiffs "had no ability to negotiate the contract of adhesion" beforehand; and the arbitration clauses were not "conspicuously noticed." In support, plaintiff attaches to their response declarations from Cooper, Wilder, and Rinella.

In reply, Endurance contends that "Illinois courts regularly find" non-mutual agreements, like Cooper's and Wilder's, "enforceable." And, it argues, it is "well settled law in Illinois that a contract is not unconscionable because one party may select the forum in the event of a dispute." (Citing, e.g., C&G Closed Cir. Events, LLC v. Castillo, No. 14-CV-02073, 2017 WL 1079241 (N.D. Ill. Mar. 22, 2017)). Endurance further asserts that plaintiffs' cited cases found substantive unconscionability because the "arbitration clauses unilaterally limit[ed] claims or

10

damages."   So, it contends, they are distinguishable.   And as for procedural unconscionability, Endurance argues that plaintiffs have waived their "conspicuously noticed" assertion for Cooper and Wilder by arguing about it in a footnote, and that by making this argument, they've conceded that Rinella's VSC clearly identifies the arbitration provision.   Endurance further asserts that the argument fails, anyway, because the headings are bolded, "alert Cooper and Wilder to" the clause, and are in a concise, single paragraph—not in a "hidden maze of fine print."   (Citation omitted).   Nor, Endurance argues, does it matter that all three purchased their VSCs over the phone: Illinois permits "take-it-or-leave-it" contracts of adhesion, and each VSC gave Cooper, Rinella, and Wilder "the opportunity to cancel without penalty within 30 or 60 days, but chose to accept the terms of the VSC."   Finally, Endurance contends that plaintiffs are essentially arguing that "the entire purchase process was procedurally unconscionable but want to pick and choose which clauses are enforceable."

The court first finds that the arbitration provisions in Cooper's, Wilder's, and Rinella's VSCs were not procedurally unconscionable.   In Illinois, a contract can be either procedurally unconscionable, substantively unconscionable, or a combination of both.   Razor v. Hyundai Motor Am., 222 Ill. 2d 75, 99 (2006).   "Procedural unconscionability refers to a situation where a term is so difficult to find, read, or understand that the plaintiff cannot fairly be said to have been aware he was agreeing to it, and also takes into account a lack of bargaining power." Jackson v. Payday Fin., LLC, 764 F.3d 765, 777 (7th Cir. 2014) (quoting Razor, 222 Ill. 2d at 100).   Relevant considerations "include whether each party had the opportunity to understand the terms of the contract, whether important terms were hidden in a maze of fine print, and all of the circumstances surrounding the formation of the contract."   Id. at 778 (citation omitted).

11

None of these considerations point toward the VSC's being procedurally unconscionable. Although the VSCs were contracts of adhesion—take-it-or-leave-it—"[s]uch contracts . . . are a fact of modern life." Kinkel v. Cingular Wireless LLC, 223 Ill. 2d 1, 26 (2006). And plaintiffs concede that they received the VSCs from Endurance after they orally agreed to them, and, as Endurance highlights, each VSC could be cancelled within at least 30 days without incurring a cost. In other words, had plaintiffs "chosen not to accept the belatedly-produced agreement," they "would have incurred no expense." G&G, 2017 WL 1079241, at *8 (citation omitted); see also Hill v. Gateway 2000, Inc., 105 F.3d 1147, 1149-50 (7th Cir. 1997) (enforcing arbitration clause even though it came in box with item where agreement allowed customer to return computer without paying a penalty); cf. Williams, 2013 WL 708123, at *3 ("In Illinois, . . . a party to a contract for consumer goods and services is bound by the contract's terms, even if unread at the exact moment of agreement, as long as the party was provided an opportunity to reject the contract later."). Plaintiffs thus had the opportunity to understand the terms of the contract.

Nor are the clauses hidden in a maze of fine print. The pages on which the clauses are located appear as follows:

| Cooper's VSC |
| --- |

purposes that fall within the definition of Commercial Use will be covered.

Q.   If any alterations have been made to Your Vehicle or You are using or have used Your Vehicle in a manner not recommended by the manufacturer, including but not limited to any custom or add-on part, trailer hitches, suspension lifts or reductions, oversized/undersized wheels or tires, emissions and/or exhaust system modifications, engine modifications, transmission modifications, drive axle modifications, and includes any performance modifications. This exclusion does not apply to suspension lift kits, oversize wheels, and/or tires when the Tire Modification/Body or Suspension Lift Option box is selected on the Application Page and the appropriate surcharge is paid. The maximum increase for a body/suspension lift combined may not exceed four (4) inches. The maximum tire height modification allowed is four (4) inches in overall diameter larger than the manufacturer's specifications as displayed on the placard of Your Vehicle. No Coverage is available for suspension reductions or undersized wheels or tires. Any modification that voids the original manufacturer warranty will also void the Coverage provided under this Contract.

R.   For any Breakdown occurring outside of the United States of America or Canada.

S.   For any Loss arising out of the unauthorized access or use of any system, software, hardware, or firmware, or any modification, reprogramming, destruction, or deletion of data or software by any means.

| IX.   LEGAL CLAIMS AND DISPUTES |
| --- |

A.   **PRE-LITIGATION REQUEST FOR RECONSIDERATION:**

If You believe We have improperly denied a claim for repairs, You should, before bringing any complaints, demands or other proceedings before any court, government agency, administrative body or third party, request a reconsideration of the denial via email to reconsideration@endurancedirect.com or via first-class mail to Endurance Dealer Services, LLC, ATTN: Reconsideration, 400 Skokie Blvd, Suite 105, Northbrook, IL 60062. Please include Your full name and Contract number, a brief description of why You believe the claim was improperly denied, and any other information or documentation You believe is relevant to the claim. Please allow Us 48 business hours from the time of receipt to respond.

B.   **ALTERNATIVE DISPUTE RESOLUTION:**

We reserve the right, in the interests of efficient and judicious resolution of disputes, to demand that any claim, complaint or demand initiated by You relating to the Coverage provided under this Contract be settled by an alternative dispute resolution procedure before a recognized and/or accredited third-party organization of Our choosing, including, but not limited to, arbitration, mediation, and/or conciliation, with the cost of such alternative dispute resolution to be paid entirely by Us. Should We elect to pursue alternative dispute resolution, We will provide a written Notice of Alternative Dispute Resolution to Your address, as identified on the Application Page, and You agree to promptly and voluntarily discontinue any pending complaint, demand or other proceeding and proceed with the alternative method selected by Us.

NO CLAIMS WILL BE PAID WITHOUT PRIOR AUTHORIZATION
CLAIMS: 877-414-0134

VSC-01D-EDS_06/22

## Wilder's VSC

I. For any repair for the purpose of correcting engine compression, correcting oil consumption, or the gradual reduction of performance when a mechanical Breakdown has not occurred. Valve grinding, valve guides, burnt valves, stuck valves, burnt piston, and/or stuck rings are not covered. Damage caused by preignition detonation, pinging, improper/contaminated fuel, fuels containing more than ten (10%) percent ethanol (if the engine was not manufactured for this mixture), excessive fuel conditions, lean fuel conditions, clogged fuel injectors, improper lubricants or improper engine adjustments. For any Breakdown caused by failure to maintain proper levels of lubrication, lubricant blockage, coolant blockage, lack of lubrication or carbon buildup. For repairs to seized or damaged parts due to operation without sufficient oil or coolant.

J. For loss of time, expense, storage charges, loss of use of Vehicle, loss of profits, income or other consequential damages, including, but not limited to loss or damage or injury to persons or property resulting from Breakdown of any of Eligible Component.

K. For accidental loss or damage, physical damage, collision or upset, road hazard, falling objects, fire, theft, larceny, hail, explosion, lightning, earthquake, windstorm, water, flood, malicious mischief, vandalism, riot, civil unrest, negligence, abuse or misuse, lack of normal maintenance required by the Owner's Manual for Your Vehicle.

L. For any Breakdown caused by rust, residue, electrolysis or corrosion. For any mechanical Breakdown caused by the failure of any nuts, bolts or fasteners unless internally lubricated.

M. For any Vehicle that has ever been declared a total loss, or has ever been issued a restricted title, including but not limited to salvage/refundable, salvage theft, assembled, dismantled, scrap, fire, flood, physical damage, saltwater, frame change, motor change, body exchange, junk or parts only, or if said vehicle is a grey market vehicle or declared a "lemon". For any loss if the odometer has failed, been broken, disconnected or altered, or if for any reason the Vehicle's actual accumulated mileage cannot be determined.

N. For a Breakdown of an Eligible Component caused by Your failure to perform reasonable repairs recommended by the dealer, Licensed Repair Facility, or Administrator. For any damage caused by failure to protect Your Vehicle from further damage when a Breakdown has occurred or failure to have Your Vehicle towed to the service facility when continued operation may result in further damage. Continued operation includes Your failure to observe warning lights, gauges, or any other signs of overheating or component failure, such as fluid leakage, slipping, knocking, or smoking, and not protecting Your Vehicle by continuing to drive creating damage beyond the initial failure. Lack of mechanical knowledge is not an excuse for continued operation. For any safety related maintenance events required by Your state or the manufacturer of Your Vehicle or a Breakdown caused by continued operation of the Vehicle in an overheated condition irrespective of thermostat failure or the lack of proper and necessary amounts of coolants or lubricants.

O. For any part or repair that a Licensed Repair Facility or manufacturer recommends or requires to be repaired, replaced, adjusted or updated (including updating software or programming), in conjunction with a Covered Repair when a Breakdown of that part has not occurred. This includes modifications, replacement, or alteration of original systems necessitated by the replacement of an obsolete, superseded, redesigned, or unavailable part. For any repair or replacement of any covered part if a Breakdown has not occurred or if the wear on that part has not exceeded the field tolerances allowed by the manufacturer under normal operating conditions, damage to a non-covered part by an Eligible Component is also excluded.

P. For Commercial Use Vehicles unless the appropriate Commercial Use Option is selected on the Application Page, and the appropriate surcharge has been paid, in which case only Vehicles that are being used for purposes that fall within the definition of Commercial Use will be covered.

Q. If any alterations have been made to Your Vehicle or You are using or have used Your Vehicle in a manner not recommended by the manufacturer, including but not limited to any custom or add-on part, trailer hitches, suspension lifts or reductions, oversized/undersized wheels or tires, emissions and/or exhaust system modifications, engine modifications, transmission modifications, drive axle modifications, and includes any performance modifications. This exclusion does not apply to suspension lift kits, oversize wheels, and/or tires when the Tire Modification/Body or Suspension Lift Option box is selected on the Application Page and the appropriate surcharge is paid. The maximum increase for a body/suspension lift combined may not exceed four (4) inches. The maximum tire height modification allowed is four (4) inches in overall diameter larger than the manufacturer's specifications as displayed on the placard of Your Vehicle. No Coverage is available for suspension reductions or undersized wheels or tires. Any modification that voids the original manufacturer warranty will also void the Coverage provided under this Contract.

R. For any Breakdown occurring outside of the United States of America or Canada.

S. For any Loss arising out of the unauthorized access or use of any system, software, hardware, or firmware, or any modification, reprogramming, destruction, or deletion of data or software by any means.

---

### IX. LEGAL CLAIMS AND DISPUTES

**A. PRE-LITIGATION REQUEST FOR RECONSIDERATION:**

If You believe We have improperly denied a claim for repairs, You should, before bringing any complaints, demands or other proceedings before any court, government agency, administrative body or third party, request a reconsideration of the denial via email to reconsideration@endurancedirect.com or via first-class mail to Endurance Dealer Services, LLC, ATTN: Reconsideration, 400 Skokie Blvd, Suite 105, Northbrook, IL 60062. Please include Your full name and Contract number, a brief description of why You believe the claim was improperly denied, and any other information or documentation You believe is relevant to the claim. Please allow Us 48 business hours from the time of receipt to respond.

**B. ALTERNATIVE DISPUTE RESOLUTION:**

We reserve the right, in the interests of efficient and judicious resolution of disputes, to demand that any claim, complaint or demand initiated by You relating to the Coverage provided under this Contract be settled by an alternative dispute resolution procedure before a recognized and/or accredited third-party organization of Our choosing, including, but not limited to, arbitration, mediation, and/or conciliation, with the cost of such alternative dispute resolution to be paid entirely by Us. Should We elect to pursue alternative dispute resolution, We will provide a written Notice of Alternative Dispute Resolution to Your address, as identified on the Application Page, and You agree to promptly and voluntarily discontinue any pending complaint, demand or other proceeding and proceed with the alternative method selected by Us.

---

### X. SPECIAL STATE-SPECIFIC REQUIREMENTS

These special state requirements apply if Your Contract was delivered in the following state and supersede any other provisions herein to the contrary:

**ALABAMA SPECIAL STATE REQUIREMENTS:**

Section III.H. Cancellations is amended as follows: If no claim has been made under this Contract, You may return the Contract within twenty (20) days of the date the Contract was mailed to You, or within ten (10) days of delivery if the Contract was delivered to You at the time of sale. In such case, if no claim has been made, this Contract will be void and We will refund the Contract Purchase Price. Any refund for a voided Contract will be paid within forty-five (45) days of receiving notice of Cancellation from You or a ten percent (10%) penalty per month will be added to the refund. The right to void the Contract is not transferable and applies only to the original Contract Holder. Subsequent to that period of time, or if You have filed a claim hereunder, We will provide a pro rata refund less an administration fee of up to twenty-five ($25) dollars. The refund will be equal to the lesser amount produced using either the number of months this Contract was in force or the number of miles, in thousands of miles or portion thereof, Your Vehicle was driven prior to Cancellation. If We cancel this Contract for a reason other than nonpayment or material misrepresentation by You, We will provide You with a written notice at Your last known address as reflected in Our files stating the effective date of and reason for Cancellation at least five (5) days prior to Cancellation.

**NO CLAIMS WILL BE PAID WITHOUT PRIOR AUTHORIZATION**
**CLAIMS: 1-877-414-0134**

14

## Rinella's VSC

Contract sale date and Contract sale mileage. If this **Contract** has been financed, the lien holder or third party finance company may cancel this **Contract** for non-payment, or if **Your Vehicle** has been declared a total loss, or if **Your Vehicle** has been repossessed. Subsequently, the rights under this **Contract** are transferred to the lien holder and the lien holder is also entitled to any resulting refund.

If this **Contract** has been financed through a third party finance company arranged by **US** or the seller **You** purchased **Your Contract** from, then financing pertains only to **Your Contract**, not **Your Vehicle**. The finance company may cancel **Your Contract** for non-payment. In the event **Your Contract** is cancelled for non-payment, **You** forfeit any and all refund rights.

### CONTRACT HOLDER'S TRANSFER CONDITIONS

This **Contract**, while in-force, may be transferred by the ORIGINAL Contract Holder to the subsequent owner of the **Vehicle** for a fee of fifty dollars ($50), payable to **Us**. The subsequent owner must also transfer the manufacturer's warranty, if available. Written evidence of all required maintenance services must be provided to **Administrator** upon transfer. Transfer is limited to an individual purchaser of the **Vehicle** (not a Dealer) and the title may not pass through a Dealer. All terms and conditions of the original **Contract** will apply to the transferee. Approval of transfers is at the discretion of the **Administrator** and may be declined for any reason. Submission of a Transfer Application must be completed within thirty (30) days of the sale or transfer of the **Vehicle** to the subsequent owner. The Transfer Application may be obtained from the selling **Administrator**, or Dealership/Entity. Refer to Special State Requirements for any exceptions or additional requirements in relation to the transfer of this **Contract**.

### RENEWABILITY

You have the right to purchase a **Contract** for additional time/mileage provided the request is made within thirty (30) days and one thousand (1,000) miles prior to the expiration of the original **Contract**. At that time, contact the **Administrator** for the terms, **Coverage** and **Deductible** options available, which may not match the original **Contract Coverage**.

### ARBITRATION

Any controversy or claim arising out of or relating to this **Contract**, or a breach hereof, shall be settled by arbitration according to the Commercial Arbitration Rules of the American Arbitration Association. Judgment upon the arbitrator's award may be entered in any court having jurisdiction thereof. **You** must notify the **Administrator** in writing of **Your** intent to seek arbitration at the following address:

Endurance Dealer Services, LLC
400 Skokie Blvd, Suite 105
Northbrook, IL 60062

### SPECIAL STATE REQUIREMENTS

These special state requirements apply if **Your Contract** was delivered in one of the following states and supersede any other provisions herein to the contrary:

**ALABAMA SPECIAL STATE REQUIREMENTS:**
The CANCELLATIONS section is amended as follows: If no claim has been made under this **Contract**, **You** may return the **Contract** within twenty (20) days of the date the **Contract** was mailed to **You**, or within ten (10) days of delivery if the **Contract** was delivered to **You** at the time of sale. In such case, if no claim has been made, this **Contract** will be void and **We** will refund the **Contract** Purchase Price. Any refund for a voided **Contract** will be paid within forty-five (45) days of receiving notice of cancellation from **You** or a ten percent (10%) penalty per month will be added to the refund. The right to void the **Contract** is not transferable and applies only to the original Contract Holder. If **You** cancel this **Contract** otherwise, **We** will provide a pro rata refund less an administration fee of up to twenty-five ($25.00) dollars. The refund will be equal to the lesser amount produced using either the number of months this **Contract** was in force or the number of miles, in thousands of miles or portion thereof, **Your Vehicle** was driven prior to cancellation. If **We** cancel this **Contract** for a reason other than nonpayment or material misrepresentation by **You**, **We** will provide **You** with a written notice at **Your** last known address as reflected in **Our** files stating the effective date of and reason for cancellation at least five (5) days prior to cancellation.

NO CLAIMS WILL BE PAID WITHOUT PRIOR AUTHORIZATION
CLAIMS: 1-877-414-0134

9 of 24

3676_2

15

To be sure, there is quite a bit of "fine print." But the clauses are not "hidden." In Rinella's VSC, "ARBITRATION" is in bold and center-aligned on the page and given space above and below. In Cooper's and Wilder's, the clause is set apart in a box with large all-CAPS text that states: "LEGAL CLAIMS AND DISPUTES." And under that box in all-CAPS is the phrase: "ALTERATIVE DISPUTE RESOLUTION." Thus, the arbitration clauses are sufficiently conspicuous.

Finally, the circumstances surrounding the formation of the VSCs also do not support procedural unconscionability. The fact is, in alleging that Endurance breached the VSCs, plaintiffs seek to enforce <u>other</u> provisions in the VSCs—including ones that were less conspicuous than the arbitration clauses. Indeed, as to all three plaintiffs, the complaint points to the clause of the VSCs that relates to coverage for the vehicle's transmission. Plaintiffs fail to explain why they understood (and now want to enforce) other provisions in the VSC that were less conspicuous than the arbitration clauses.

In short, the arbitration terms were not "so difficult to find, read, or understand that the plaintiff[s] cannot fairly be said to have been aware [t]he[y] w[ere] agreeing to [them]." <u>Jackson</u>, 764 F.3d at 777. The court thus finds that the clauses are not procedurally unconscionable.

As a result, the court finds that Rinella is subject to an enforceable written agreement to arbitrate. Unlike with Cooper and Wilder, plaintiffs do not contend that the arbitration term in Rinella's VSC is substantively unconscionable. The court therefore grants the motion to compel arbitration as to Rinella.

That leaves the question whether the arbitration term in Cooper's and Wilder's VSCs is substantively unconscionable. Substantive unconscionability "concerns the actual terms of the contract and examines the relative fairness of the obligations assumed." Jackson, 764 F.3d at 778 (quoting Kinkel, 223 Ill.2d at 28). "A contract will be found substantively unconscionable whe[n] its terms are so one-sided that they oppress or unfairly surprise an innocent party, when there is an overall imbalance in the obligations and rights imposed by the bargain, or when a significant cost-price disparity exists." Hwang v. Pathway LaGrange Prop. Owner, LLC, 2024 IL App (1st) 240534, ¶ 16 (cleaned up). "When examining the substantive provisions of an arbitration agreement, courts are more likely to find unconscionability when a consumer is involved and has no hand in the drafting of the agreement, when there is a disparity in bargaining power, and when the agreement is on a preprinted form." Id. (cleaned up).

The court finds that Cooper's and Wilder's arbitration term is substantively unconscionable. The provision states:

> B. ALTERNATIVE DISPUTE RESOLUTION: **We** reserve the right, in the interests of efficient and judicious resolution of disputes, to demand that any claim, complaint or demand initiated by **You** relating to the **Coverage** provided under this Contract be settled by an alternative dispute resolution procedure before a recognized and/or accredited third-party organization of **Our** choosing, including, but not limited to, arbitration, mediation, and/or conciliation, with the cost of such alternative dispute resolution to be paid entirely by **Us**. Should **We** elect to pursue alternative dispute **resolution**, **We** will provide a written Notice of Alternative Dispute Resolution to Your address, as identified on the **Application Page**, and **You** agree to promptly and voluntarily discontinue any pending complaint, demand or other proceeding and proceed with the alternative method selected by **Us**. (Emphasis in original.)

As explained above, plaintiffs first argue that the clause's "obligation to arbitrate is entirely one-sided." (cleaned up). But "the parties do not have to bind themselves to identical obligations in order to avoid substantive unconscionability." Williams, 2013 WL 708123, at

*11 (rejecting argument that arbitration provision was unconscionable because it was not mutual). To the contrary: under Illinois law, when, as here, the arbitration provision is part of a "broader contract"—as opposed to a separate arbitration agreement—"mutuality of obligation pursuant to the arbitration provision is not required" so long as "the requirement of consideration has been met in the contract." Molton, Allen & Williams, LLC v. Cont'l Cas. Ins. Co., No. 09-CV-6924, 2010 WL 780353, at *5 (N.D. Ill. Mar. 3, 2010) (collecting cases and rejecting argument that a one-sided arbitration clause rendered the arbitration provision unenforceable). Plaintiffs do not contend here that the VSCs lacked valid consideration. For good reason: Endurance's promise to provide vehicle coverage would provide some. See Williams, 2013 WL 708123, at *11 ("Banking services provided by TCF would also be valid consideration."); Molton, 2010 WL 780353, at *6 n.1 ("Consideration is defined as a bargained-for exchange of promises or performance. An act or promise that benefits one party or is a detriment to the other party is consideration sufficient to support a contract." (citation omitted)). That the arbitration provision's obligation to arbitrate is one-sided thus does not—at least on its own—show substantive unconscionability.[1]

Yet the court agrees with plaintiffs that the clause is still substantively unconscionable. That is because the arbitration clause "gives [Endurance] the power to choose" any "forum and

---

[1] Plaintiffs' reliance on Hwang for the proposition that "an agreement may be supported by consideration yet be substantively unconscionable," 2024 IL App (1st) 240534, ¶ 16, does not convince the court otherwise. That is because the arbitration agreement there, unlike Cooper's and Wilder's here, was a separate agreement that was "separately signed by both parties." Id. at ¶ 5. Courts in this district have distinguished such contracts from those, like the ones here, in which the arbitration provision is part of a broader contract. See Molton, 2010 WL 780353, at *5.

18

set of rules for resolving this dispute"—including "expensive" and otherwise inappropriate forums.  <u>Bain v. Airoom, LLC</u>, 2022 IL App (1st) 211001, ¶ 48.

<u>Bain</u> is instructive here.  The Illinois Appellate Court there found substantively unconscionable an arbitration clause in a home-remodeling contract that gave the builder-defendant, Airoom, sole discretion to select the arbitral forum and procedures in the event of a dispute with the customer-plaintiff, Mary Bain.  <u>Id.</u> at ¶ 42.  The clause provided that "[a]ll arbitrations shall be conducted . . . before an arbitrator selected in accordance with, and shall be conducted pursuant to, the Construction Industry Arbitration Rules of the American Arbitration Association (www.adr.org) or any other alternative dispute resolution firm, at Airoom's sole and absolute discretion."  <u>Id.</u> at ¶ 6.  The court found that those "Construction Industry" rules "were designed primarily for complex construction industry disputes," and that they required high administrative and arbitrator fees—far exceeding the more consumer-friendly AAA Home Construction Arbitration Rules.  <u>Id.</u> at ¶¶ 42-46.  So they were "plainly ill-suited for and unnecessarily costly for someone suing a company that has done renovation work on their residential home."  <u>Id.</u> at ¶ 42.  Nor, the court further explained, did the language giving Airoom the right to choose different rules or a different forum "at its sole and absolute discretion" make the provision less unconscionable: "the provision simply g[ave] Airoom the power to choose another, perhaps even more expensive and less appropriate, forum and set of rules for resolving this dispute."  <u>Id.</u> at ¶ 48.  The court thus held that the one-sided forum/rules provision was substantively unconscionable.  <u>Id.</u> at ¶ 50.

The arbitration clause here is as unconscionable or worse than the one in <u>Bain</u>.  It, too, gives Endurance the "power to choose" an expensive and inappropriate forum and set of rules.

19

In fact, it is even broader than the one in <u>Bain</u>: it grants Endurance sole discretion to select a "procedure before a recognized and/or accredited third-party organization of [Endurance's] choosing, including . . . arbitration, mediation, and/or conciliation." It accordingly grants Endurance the ability to select a method, procedure, and forum that is prohibitively expensive, complex, or favorable to its interests. Endurance, for example, could choose a forum that is expensive to travel to or to litigate in. True, the clause does go on to state that Endurance will pay the "cost of such alternative dispute resolution." But the term "cost" is ambiguous—it is unclear, for example, if it includes administrative fees and arbitrator fees, or if it includes other expenses like travel, hearing room rentals, attorney fees, and so on. And although the clause does not explicitly limit remedies, its grant of sole discretion to Endurance allows Endurance to dictate the entire dispute-resolution framework without any consumer input. It could thus potentially allow for rules that limit Cooper's and Wilder's available remedies.

Endurance's reliance on cases like <u>C&G</u> is misplaced. Endurance argues that <u>C&G</u> supports the notion that "a contract is not unconscionable because one party may select the forum in the event of a dispute." But the clause at issue in <u>C&G</u> "incorporate[d] JAMS rules expressly." 2017 WL 1079241, at *9. "[S]o customers" there could "ascertain the dispute resolution processes and rules to which they were agreeing." <u>Id.</u> (quoting <u>Jackson</u>, 764 F.3d at 778). Cooper and Wilder had no such ability here.

Because the clause here gives Endurance sole control to select a company-friendly process with uncertain costs and remedies, it creates an improper imbalance in obligations and rights. Further exacerbating that imbalance, moreover, is the fact that Cooper and Wilder had "no hand in [the] drafting of the agreement," that "there is a disparity in bargaining power," and

20

that "the agreement is on a preprinted form." Hwang, 2024 IL App (1st) 240534, ¶ 16 (cleaned up).

The court therefore finds that the arbitration clause in Cooper's and Wilder's VSCs is substantively unconscionable. The court consequently denies Endurance's motion to compel Cooper and Wilder to arbitrate their claims based on their VSCs.

Rinella's, Cooper's, and Rumpf's Website Use

Endurance argues that Rinella, Rumpf, and Cooper "each agreed to arbitrate any disputes when they accepted Endurance's terms and conditions as part of obtaining VSC quotes" on Endurance's website. "Illinois contract law requires that a website provide a user reasonable notice that his use of the site or click on a button constitutes assent to an agreement." Sgouros, 817 F.3d at 1036. "One way" that a website can do that is by using "clickwrap" agreements. Domer, 116 F.4th at 694. A website, for example, "might be able to bind users to a service agreement by placing the agreement, or a scroll box containing the agreement, or a clearly labeled hyperlink to the agreement, next to an 'I Accept' button that unambiguously pertains to that agreement." Sgouros, 817 F.3d at 1036. On the other hand, a website generally will not have provided reasonable notice if it uses "browsewrap" agreements—agreements that "provide veiled notice to customers that mere use of the website constitutes agreement to various terms and conditions." Domer, 116 F.4th at 694-95. Indeed, "[b]rowsewrap agreements typically are not enforced." Id. at 695.

"[F]all[ing] somewhere in between these two forms of agreement" are websites that "rely on simply displaying, somewhere on a webpage, a notice of deemed acquiescence and a link to the putative terms." Id. (cleaned up). In that situation, "purported assent is largely passive."

21

Id. (citation omitted). "And when assent is passive, a court will recognize an enforceable contract only if: (1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms." Id. (cleaned up). Although these two parts "may involve underlying facts, they are questions of law" that require "a fact-intensive legal analysis." Id.

Endurance characterizes the agreements here as "click-wrap" agreements. As for Cooper, Endurance asserts: that she got her quote from "shopcarwarranty.com, a third-party website"; that she "assented to" Shop Car Warranty's website's Term & Conditions ("T&Cs") by clicking a button to receive a quote; that those T&Cs "connect[ ] you with contractors and other providers who may be able to assist you with your AutoWarranty"; that under a "Links to Other Websites" heading, the T&Cs say that the website includes links to other websites and that "[y]our rights to such content will be governed by the terms of those third-party websites"; and that by accepting the Shop Car Warranty T&Cs "to obtain a quote from Endurance, Cooper agreed to Endurance's" T&Cs, which include "an agreement to arbitrate."

The court finds that Cooper did not—and could not—assent to Endurance's T&Cs. As plaintiffs note in their response to Endurance's motion, "Cooper clicked a button to obtain a quote from 'shopcarwarranty.com'" (emphasis removed)—not Endurance's website. And on the page in which she clicked, "[n]owhere was Cooper provided with shopcarwarranty.com's T&C[s]"—let alone Endurance's T&Cs. In its opening brief, Endurance provides a screenshot of text that it claims Cooper would have seen and that underlines in red ink a link to Shop Car Warranty's "Terms & Conditions." (ECF 15-4, Exhibit D). Yet the video exhibit that

22

Endurance attached (ECF 15-3, Exhibit C)—and which allegedly shows what Cooper saw—shows a different set of text that omits any such link. Perhaps that is why Endurance does not attempt to rehabilitate its argument about Cooper in its reply brief. In fact, there, Endurance fails to even mention its Cooper-website argument, fails to explain this discrepancy, and fails to withdraw its argument.[2] Because Endurance fails to show that Cooper assented to any T&Cs—much less Endurance's—the court denies the motion to compel arbitration as to Cooper.

As for Rinella and Rumpf, Endurance argues that: they "obtained quotes for their VSCs directly through Endurance's website"; the website "required them to actively accept Endurance's" T&Cs—including the "agreement to arbitrate" contained therein; and they did this by clicking an "I Accept" button. In support, Endurance attaches a declaration from Daniel Wilner, Endurance's "Litigation Manager," in which he states that he has provided a "Certificate of Authenticity for Web Leads, certified log and certified TrustedForm video replay" of Rumpf's and Rinella's respective "interaction with the Endurance" website. He further states that the "Certificate of Authenticity shows that" Rumpf and Rinella "actively clicked 'I Accept' next to [Endurance's T&Cs] before receiving a quote." And the video exhibits, he further avers, show what Rinella and Rumpf saw on the website.

But Endurance fails to explain where in the Certfiicate of Authenticity there is support for Wilner's assertion that either plaintiff clicked "I Accept" or clicked an "I Accept" button. The phrase "I Accept" appears nowhere in the documents. Nor do the video exhibits support Wilner's assertion. Below are screenshot excerpts from their video attachments:

---

[2] The court reminds Endurance that it owes a duty of candor to the court.

**Screenshot Excerpt from Rinella's Video**





The button available to both Rinella and Rumpf was a "Get a FREE Quote" button—not an "I Accept" button. Contrary to Endurance's assertion, then, these are not "clickwrap" agreements. See Domer, 116 F.4th at 699-700 ("Unlike with pure clickwrap agreements, clicking 'SUBMIT ORDER' does not specifically manifest assent to the additional arbitration terms, for the purchaser is not specifically asked whether she agrees or to say 'I agree.'" (cleaned up)); Sgouros, 817 F.3d at 1036 (website "might be able to bind users to a service agreement by placing the agreement, or a scroll box containing the agreement, or a clearly labeled hyperlink to

25

the agreement, next to an 'I Accept' button that unambiguously pertains to that agreement"). They are instead hybrid agreements, which again, are enforceable "only if: (1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms." Domer, 116 F.4th at 695.

Endurance fails to show that the webpage that Rumpf was on where she clicked the "FREE Quote" button provided reasonably conspicuous notice of the T&Cs or that she unambiguously manifested her assent to those T&Cs by clicking the button. Indeed, as shown above, the video exhibit shows only a sentence fragment under the button. And the text in that sentence fragment neither provides a link to the T&Cs nor suggests that by clicking the "FREE Quote" button, Rumpf would be consenting to any T&Cs.

Plaintiffs pointed this omission out to Endurance in their response brief. But Endurance failed to remedy it in its reply. Endurance instead doubled down and suggested that the same text that was shown to Rinella was shown to Rumpf. But the court cannot accept that suggestion. The only support Endurance provides for it is the video exhibit for Rinella (Doc. 15-2, "Exhibit B")—not Rumpf. And the above screenshots show that Rinella and Rumpf were confronted with different looking webpages. Perhaps they were ultimately confronted with the same text. But the court cannot take Endurance's unsupported word for it—especially given that Wilner's assertion about Rinella and Rumpf both clicking "I Accept" appears to be wrong. And because Endurance had the opportunity to provide evidence to support its argument in reply—but did not do so—it has waived its ability to support that assertion. Cf. United States v. Farris, 532 F.3d 615, 619 (7th Cir. 2008) ("Farris failed to respond to the Government's

26

argument in a Reply Brief, and accordingly, we find that Farris waived his sufficiency of the evidence challenge[.]").   The court accordingly denies Endurance's motion to compel arbitration as to Rumpf.

As for Rinella, however, the court finds that an enforceable arbitration agreement was formed when Rinella pressed the button for a price quote.   To start, Endurance's notice was reasonably conspicuous and Rinella manifested his assent to accept the T&Cs by pressing the button to obtain the price quote.   Plaintiffs do not meaningfully argue otherwise.   That is not surprising.   Based on the video exhibit, the webpage that Rinella was on: had a relatively simple screen; had a clear disclosure indicating that by clicking on the "Get a FREE Quote" button, the user would be bound to the T&Cs; and had a clearly marked link to the T&Cs, which was closely placed next to the button.   These are relevant factors that all support reasonable conspicuousness.   See Domer, 116 F.4th at 695 (setting forth factors in analyzing reasonable conspicuousness).

Plaintiffs tepidly suggest that a case in which a website did not include "language that linked the notice regarding . . . the terms and conditions to the 'Continue' button," supports their argument that Rinella should not be bound.   (Quoting Anand v. Heath, No. 19-CV-00016, 2019 WL 2716213, at *5 (N.D. Ill. June 28, 2019)).   But their suggestion is misplaced.   Again, the webpage that Rinella used here did include language that linked the T&Cs to the "Get a FREE Quote" button.   In particular, the disclosure next to the button states in consecutive sentences: "By clicking the button, you consent to Endurance using automated technology to call, email and text you . . . .   You also agree to the Endurance . . . Terms and Conditions."   (Emphasis added).

27

Ultimately, plaintiffs' principal argument appears to be that an invitation to receive a free quote is not an offer that Rinella could have accepted, because Rinella was under no obligation to accept the quote and purchase a VSC. The court disagrees. Endurance offered Rinella a quote for a VSC that was contingent on him agreeing to Endurance's T&Cs. By clicking the button and obtaining the quote, he assented to the T&Cs. That Rinella was under no obligation to thereafter accept the quote and purchase a VSC is beside the point—he was already bound by Endurance's T&Cs when he clicked the button to receive the quote. Rinella was consequently subject to an enforceable arbitration agreement based on his use of the Endurance website.[3]

In sum, the court finds that Rinella was subject to an enforceable arbitration agreement based on both his VSC and his use of Endurance's website. The court thus grants Endurance's motion to compel arbitration as to Rinella. But the court finds that neither Cooper, Wilder, nor Rumpf were subject to an enforceable arbitration agreement. The arbitration agreement in Cooper's and Wilder's VSCs is substantively unconscionable. And Endurance failed to show that either Cooper or Rumpf assented to any arbitration agreement in Endurance's T&Cs through their website use. The court therefore denies Endurance's motion to compel arbitration as to Cooper, Wilder, and Rumpf.

## MOTION TO DISMISS

The court turns now to Endurance's motion to dismiss under Fed. R. Civ. P. 12(b)(6). A motion to dismiss for failure to state a claim under Rule 12(b)(6) challenges the sufficiency of

---

[3] The court notes that plaintiffs do not, as they did with the VSCs, argue that the arbitration provision in Endurance's T&Cs is unconscionable. Nor does it appear to be—the provision is reasonable and mutual, providing that, for "[a]ny controversy, claim or dispute arising between the parties," "either party may initiate binding arbitration" and the "arbitration shall be initiated and conducted according to [AAA] rules and procedures for consumer arbitration."

the complaint.   See Gibson v. City of Chi., 910 F.2d 1510, 1520 (7th Cir. 1990).   To survive a

Rule 12(b)(6) motion, the complaint must provide the defendant with fair notice of a claim's

basis and must be facially plausible.   See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Bell Atl.

Corp. v. Twombly, 550 U.S. 544, 555 (2007).   "A claim has facial plausibility when the plaintiff

pleads factual content that allows the court to draw the reasonable inference that the defendant is

liable for the misconduct alleged."   Iqbal, 556 U.S. at 678.   "[W]here the well-pleaded facts do

not permit the court to infer more than the possibility of misconduct, the complaint has alleged—

but has not shown—that the pleader is entitled to relief."   Id. at 679 (cleaned up).

Endurance challenges the complaint on several grounds.   The court addresses each

challenge in turn.

### Waiver of Class Action Rights

Endurance first argues that all five named plaintiffs—Rumpf, Rinella, Cooper, Kujawa,

and Wilder—"waived their right to pursue their claims as a class action, requiring dismissal of

their claims."   First, Endurance argues, "Rinella, Rumpf, and Cooper agreed to waive class

participation via their acceptance of the Click-Wrap Agreement"—meaning, Endurance's T&Cs.

But the court has already determined that Endurance has failed to show that either Rumpf or

Cooper were subject to Endurance's T&Cs.   The court thus denies the motion as to Rumpf and

Cooper to the extent it is based on Endurance's T&Cs.

As for Rinella, the court agrees with Endurance that he has waived his ability to arbitrate

his claims as a class action.   Arbitration agreements must be enforced "according to their

terms."   Lamps Plus, Inc. v. Varela, 587 U.S. 176, 183 (2019) (citation omitted).   A party

therefore "may not be compelled under the FAA to submit to class arbitration unless there is a

29

contractual basis for concluding that the party *agreed* to do so." Id. at 178 (citation omitted) (emphasis in original). Also, class action waivers are enforceable. See Epic Sys. Corp. v. Lewis, 584 U.S. 497, 508-09 (2018); Am. Express Co. v. Italian Colors Rest., 570 U.S. 228, 236-38 (2013).

Here, as explained above, Rinella is subject to the T&Cs—including the arbitration provision therein—based on his use of the Endurance's website. Endurance argues that the arbitration provision states: "EACH PARTY IRREVOCABLY WAIVES ANY RIGHT IT MAY HAVE TO JOIN CLAIMS OR DISPUTES WITH THOSE OF OTHERS IN THE FORM OF A CLASS ACTION, CLASS ARBITRATION OR SIMILAR PROCEDURAL DEVICE . . . ." (All caps in original, emphasis added). Yet (incredibly) the copy of the T&C's that Endurance attaches to its motion as an exhibit omits the underlined language. Nevertheless, Endurance also cites its website—endurancewarranty.com/terms-and-conditions—where the full language does appear. And plaintiffs do not dispute that, if Rinella is subject to the T&Cs, he would be subject to the class waiver. The court therefore finds that Rinella has waived his ability to arbitrate his dispute as a class action.

Endurance next argues that Kujawa, Wilder, and Cooper each waived bringing class actions through finance agreements with a third-party company, MEPCO. According to Endurance, these three plaintiffs financed their VSCs through MEPCO. And the agreement with MEPCO has a "**WAIVER OF CLASS ACTION**," which states: "PURCHASER HEREBY WAIVES ANY RIGHT TO BRING ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT, THE CONTRACT OR ANY MATTER ARISING IN CONNECTION THEREWITH ON A CLASS ACTION BASIS. (All caps and emphasis in

original).   Endurance suggests that the term "Contract" refers to the respective VSCs, and that the "MEPCO Agreement" is "included with the VSC[s]."[4]   The MEPCO Agreement, Endurance goes on, also includes a choice of law provision that states that New York state law should govern.   And "New York law permits third-party enforcement of a contract when the original parties to the contract intentionally entered the contract for the direct benefit of that third party."   Because the MEPCO Agreement states that it was "entered into to enable Purchaser to pay for the Contract [the VSC] pursuant to an installment payment program," Endurance argues that it is for Endurance's benefit.

In response, plaintiffs argue that New York law allows a third party to enforce a contract only "when it is . . . clear from the language of the contract that there was 'an intent to permit enforcement by the third party.'"   (Quoting Comm'r of the Dep't of Soc. Servs. of the City of N.Y. v. N.Y.-Presbyt. Hosp., 82 N.Y.S. 3d 390, 394 (App. Div. 1st Dept. 2018)).   But here, they assert, "there is no provision of the Agreement that permits enforcement by" Endurance.   Rather, the "only provision of the Agreement that relates to third-party enforcement is assignment, which allows MEPCO to assign or pledge its rights."

The court finds that Endurance is a third-party beneficiary of the class action waiver in the MEPCO Agreement.   "Under New York law," a third party can "enforce a contract if that party is an intended beneficiary of the contract."   Granite Partners, L.P. v. Bear, Stearns & Co.

---

[4] Endurance again injects confusion into its motion by referring for the first time to a "Purchase Agreement," a "MEPCO Agreement," and "Payment Plans" without defining those terms.   The court assumes here that they all are synonyms for the agreement with MEPCO.   Precision in defining terms takes on particular importance when, as here, there are several named plaintiffs and several different agreements at issue.

Inc., 58 F. Supp. 2d 228, 247 (S.D.N.Y. 1999). "The general test for third-party beneficiary

status, as adopted by New York from the Restatement (Second) of Contracts is as follows:

> (1) Unless otherwise agreed between promisor and promisee, a beneficiary of a
> promise is an intended beneficiary if recognition of a right to performance in the
> beneficiary is appropriate to effectuate the intention of the parties and either (a) the
> performance of the promise will satisfy an obligation of the promisee to pay money
> to the beneficiary; or (b) the circumstances indicate that the promisee intends to
> give the beneficiary the benefits of the promised performance."

Id. at 247-48 (quoting Restatement (Second) of Contracts § 302 (1981)). When "the obligation

to perform to the third-party beneficiary is not expressly stated in the contract at issue, a court

may look to surrounding circumstances to determine whether the contracting parties intended to

benefit a third party." Id. at 248 (cleaned up).

Applying these standards here, Endurance is a third-party beneficiary. As Endurance

points out, the MEPCO Agreement states that it was "entered into to enable Purchaser to pay for

the [VSC] . . . ." And it is included within the same document that includes the VSC. Kujawa,

Wilder, and Cooper have thus each waived bringing class actions against Endurance.

In short, the court finds: that Endurance has failed to show that either Rumpf or Cooper

were subject to Endurance's T&Cs; that Endurance has shown that Rinella is subject to the

T&Cs and its class action wavier; and that Kujawa, Wilder, and Cooper each waived bringing

class actions against Endurance based on the MEPCO Agreement. The court thus grants the

motion to dismiss the class allegations as to Cooper, Kujawa, Rinella, and Wilder without

prejudice to their ability to assert individual claims. It further denies the motion as to Rumpf.

## Class Action Allegations

Endurance next argues that plaintiffs' proposed class and subclasses must be dismissed or

stricken. Rule 12(f) permits a court to "strike from a pleading an insufficient defense or any

redundant, immaterial, impertinent, or scandalous matter." Rule 23(c)(1)(A) requires a court to determine whether to certify an action as a class action "[a]t an early practicable time." And Rule 23(d)(1)(D) provides that "the court may issue orders that . . . require the pleadings be amended to eliminate allegations about representation of absent persons and that the action proceed accordingly . . . ." Thus, "[t]he interplay of Rules 12(f), 23(c)(1)(A), and 23(d)(1)(D) empowers the Court to dismiss or strike class allegations at the pleading stage." Murdock-Alexander v. Tempsnow Emp., No. 16-CV-5182, 2016 WL 6833961, at *3 (N.D. Ill. Nov. 21, 2016).

Although "the decision to strike material is within the discretion of the court, . . .the general rule is that motions to strike are disfavored." Id. (cleaned up). This general rule takes into account that the fact that, while plaintiffs generally must show that they meet the Rule 23 requirements, "[c]lass action defendants . . . are often in control of the information plaintiffs need to meet that burden," and so "discovery is often appropriate, even necessary." Id. (citation omitted). "Given the general aversion to unripe motions to strike, a court should address class allegations at the pleading stage only when the pleadings are facially defective and definitively establish that a class action cannot be maintained." Id. at *4 (cleaned up). Or said another way, courts should strike class allegations at the pleading stage only "when they are facially and inherently deficient." Miles v. Am. Honda Motor Co., No. 17 C 4423, 2017 WL 4742193, at *5 (N.D. Ill. Oct. 19, 2017) (citation omitted).

Endurance argues that the class allegations here are facially and inherently deficient. It first contends that the classes are facially overbroad. According to Endurance, "Plaintiffs propose a Nationwide Class consisting of '[a]ll persons in the United States who purchased a

33

[VSC] through Defendants' and State Subclasses consisting of '[a]ll persons of the Nationwide Class who are residents of the states of Michigan, New Jersey, Ohio, Pennsylvania, and Texas and purchased a [VSC] through Defendants in one of the aforementioned states.'"   (Quoting the complaint).   These definitions are facially overbroad, Endurance asserts, because: the proposed Nationwide Class "includes everyone who ever purchased an Endurance VSC, regardless of the type of contract"; plaintiffs do not claim that every class member was harmed by Endurance's actions; plaintiffs do not include any temporal limitations; and the state subclasses "seek to stratify the class into every Endurance VSC holder in five states without further delineation."

In response, plaintiffs argue that the classes are not overbroad.   According to plaintiff, they allege that "they and all other Endurance consumers 'paid for a [VSC] that does not provide the promised coverage that was the basis of the bargain'" (Quoting the complaint)—an injury that "occurred at the time of sale."   And they argue that any overbreadth can be refined through discovery.   (Citing Messner v. Northshore Univ. HealthSystem, 669 F.3d 802, 825 (7th Cir. 2012)).

In reply, Endurance again contends that the claims broadly sweep within it persons who could not have been injured by the alleged conduct.   (Citing Kohen v. Pac. Invest. Mgmt. Co., 571 F.3d 672, 677 (7th Cir. 2009)).   And it further argues that the claims here are "governed by different States' laws, a largely legal determination, and no proffered or potential factual development offers any hope of altering that conclusion."   (Quoting Hill v. Wells Fargo Bank, N.A., 946 F. Supp. 2d 817, 830 (N.D. Ill. 2013)).

The court agrees with Endurance that the currently pleaded classes are facially and inherently deficient.   True, an overbroad class can often be refined through discovery.   But

34

here, plaintiffs do not dispute that the complaint mentions several types of VSCs and types of contract, and that the class includes every purchaser. As alleged, the proposed class groups together those with different contractual rights and performance expectations. And an open-ended class of "all persons" reaching back indefinitely would almost certainly include contracts that are now fully performed or expired without incident. It could include contracts that predate the alleged deceptive conduct. In addition, as the five State Subclasses suggest, the Nationwide Class includes members whose legal claims are likely governed by the laws of 50 different states. Because plaintiffs' claims "must be adjudicated under the laws of so many jurisdictions, a single nationwide class is not manageable." <u>Miles</u>, 2017 WL 4742193, at *5 (striking a "proposed nationwide class," explaining that "[a]pplying the warranty, unjust enrichment, and misrepresentation laws of 50 different states, or even the 4 states that the named plaintiffs represent, is unmanageable on a class-wide basis because those state laws may conflict in material ways"). The currently pleaded classes are thus facially and inherently deficient.[5]

## **Fraud Allegations in Counts III and IV**

Endurance next asserts that plaintiffs' claims for fraudulent concealment (Count III) and common law fraud (Count IV) must be dismissed. Endurance first argues that plaintiffs failed to plead those claims with the particularity required under Fed. R. Civ. P. 9(b). As a result, it

---

[5] Endurance also argues that plaintiffs plead no basis for injunctive or declaratory relief and therefore fail to satisfy Rule 23(b)(2). But the court has now struck the class allegations based on the defined class under Rule 23(a). Because a class action under Rule 23(b)(2) may be maintained only if Rule 23(a) is satisfied, the court need not address this issue. <u>See</u> Fed. R. Civ. P. 23(b) ("A class action may be maintained if Rule 23(a) is satisfied and if . . . .").

contends, those counts (along with the consumer protection statute counts that are predicated on the alleged fraudulent conduct) must be dismissed.

When, as here, some of the "complaint's allegations sound in fraud," "those allegations are held to a heightened pleading standard under Rule 9(b)." Sava v. 21St Century Spirits, LLC, No. 22 C 6083, 2024 WL 3161625, at *5 (N.D. Ill. June 25, 2024). Rule 9(b) states that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake," but that "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). Rule 9(b)'s particularity requirement for the fraud aspect "ordinarily" requires describing the "who, what, when, where, and how of the fraud—the first paragraph of any newspaper story." Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co., 631 F.3d 436, 441-42 (7th Cir. 2011) (cleaned up). Such detail "is required in part because of the potential stigmatic injury that comes with alleging fraud and the concomitant desire to ensure that such fraught allegations are not lightly leveled." Id. at 442. But the precise level of detail that must be "included in that first paragraph . . . may vary on the facts of a given case." Id.

To that end, the "who, what, where" formulation "is not meant to suggest that every possible who, what, where, when, or how within the alleged factual circumstances must be stated with particularity; . . . it is meant only to distill the specific inquiries under Rule 9(b)." Sava, 2024 WL 3161625, at *11. Those are: "the identity of the person making the misrepresentation,

the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." Id. at *5 (citation omitted).

Rule 9(b), moreover, applies to allegations—not claims. "[S]o only those allegations sounding in fraud are held to the rule's 'particularity' requirement; all other allegations must satisfy only *Twombly* and *Iqbal*'s 'plausibility' requirement, even if those allegations support a claim where fraud is an essential element." Id. (citing Appvion, Inc. Ret. Sav. & Emp. Stock Ownership Plan v. Buth, 99 F.4th 928, 944-45 (7th Cir. 2024)). Thus, "when an allegation comes up short" under Rule 9(b), "the court simply disregards the allegation and does not *automatically* dismiss the claim." Id. at *6 (emphasis in original).

With these principles in mind, the court turns to Endurance's arguments. Endurance argues that "[n]owhere in" plaintiffs' fraudulent concealment and common law fraud claims "do Plaintiffs identify with the requisite specificity Endurance's alleged misrepresentations and omissions." According to Endurance, the claims are missing the "what," "when," and "where."

Plaintiffs assert in response that Endurance's argument "ignores whole sections of the Complaint." The complaint, plaintiffs argue, "includes Endurance's statements (with citations) touting the VSCs and Endurance's business practices, including promising coverage 'at any licensed repair facility,' covering vehicles with over 200,000 miles, a 'stress-free claims process' that takes as 'little as 48 hours,' and being the direct administrator of the VSCs." (Quoting the complaint). And, plaintiffs continue, plaintiffs allege that they "purchased VSCs based on Endurances' 'advertisements and representations that [their] vehicle would be covered by the contract in the event it needed repairs, particularly for the parts listed on Endurance's website.'" (Quoting the complaint).

37

The court finds that plaintiffs have pleaded their fraud allegations with sufficient particularity.   Here, plaintiffs allege that Endurance made several specific misrepresentations— about coverage "at any licensed repair facility," about a "stress-free claims process" that takes as "little as 48 hours," and about being the direct administrator of the VSCs.   Plaintiffs further provide in their complaint excerpts and hyperlinks to specific pages on Endurance's website that contain the misrepresentations.   And they also allege that they purchased the VSCs based on those representations.   Thus, plaintiffs have provided: the "who" (Endurance); the "what" (the specific false statements about Endurance's services); the "when" (before dates of purchase); the "where" (the statements are on Endurance's website and plaintiffs purchased VSCs from Endurance), and the "how" (by falsely representing on the website, which caused plaintiff to purchase VSCs that they would not otherwise have purchased).

Under the facts of this case, then, plaintiffs have set forth "the first paragraph of [the] newspaper story" on its fraud claims, Pirelli, 631 F.3d at 442.   "Nothing more is needed." Vanzant v. Hill's Pet Nutrition, Inc., 934 F.3d 730, 739 (7th Cir. 2019) (reversing district court's finding that the complaint lacked Rule 9(b) specificity).   Counts III and IV thus satisfy Rule 9(b)'s particularity requirement and the court will therefore not dismiss them under Rule 9(b).[6]

---

[6] The court notes that Count III is entitled "fraudulent concealment."  (Emphasis added).   But the claim alleges both omissions and misrepresentations, and the parties focus solely on the who, what, when, etc. of the latter.   "Courts in this circuit have recognized that the standard to state a fraudulent omission claim under Rule 9(b) is more relaxed than the typical fraud claim."   Fed. Deposit Ins. Corp. v. Patel, No. 19-CV-6917, 2020 WL 6681348, at *2 (N.D. Ill. Nov. 12, 2020) (cleaned up).   That is because "[i]n a fraudulent concealment claim there is no who, what, when, where or how the fraudulent statement was made, since the essence of the claim is that facts material to the transaction that should have been disclosed were not disclosed by any person at any time, in any place or in any manner."   Id. (citation omitted).   Given that Endurance does not meaningfully argue about the who, what, where of any omissions, and given that plaintiffs have sufficiently alleged the particulars of the misrepresentations, the court will also not dismiss

Particularity aside, Endurance also contends that Counts III and IV must be dismissed because they "arise from the same facts and allegations as [the] breach of contract claim," and are therefore not distinct from that claim. (Citing <u>Greenberger v. GEICO Gen. Ins. Co.</u>, 631 F.3d 392, 401 (7th Cir. 2011)). The court disagrees.

Endurance is correct that "a fraud claim cannot rest on the same ground as a claim of breach of contract." <u>Five-Star AudioVisual, Inc. v. Unique Bus. Sys. Corp.</u>, 769 F. Supp. 3d 840, 852 (N.D. Ill. 2025). "After all, the mere fact that a defendant promised something and then failed to do it occurs every time a defendant breaches a contract." <u>Id.</u> (cleaned up). So "[t]o bring a fraud claim, a plaintiff must allege a 'fraudulent act distinct from the alleged breach of contract.'" <u>Id.</u> (quoting <u>Greenberger</u>, 631 F.3d at 401).

Plaintiffs have done that here. Plaintiffs' breach of contract claim alleges that Endurance "breached [its] contracts with Plaintiffs and the Class when [it] failed to timely process claims and/or cover repairs under the [VSC] by denying claims." Plaintiffs' fraudulent concealment claim alleges that Endurance "made material misrepresentations and omissions," "did not fully and truthfully disclose to customers the true nature of the coverage under the [VSCs] or the timeliness upon which [Endurance] would render decisions" under the VSCs, and that plaintiffs and the class "were fraudulently induced to purchase" the VSCs. And plaintiffs' common law fraud claim alleges that Endurance "marketed that [its] [VSCs] provided comprehensive coverage and peace of mind and protection from repair bills," which "induced Plaintiffs and the Class members to purchase" the VSCs.

---

the claim to the extent it relies on omissions.

"True, the fraud claim[s] and the breach-of-contract claim sound similar." Five-Star AudioVisual, 769 F. Supp. 3d at 852. But they are not identical. To the contrary, the fraud claims are based on what Endurance said "it *could* do *before* [plaintiffs] and [Endurance] entered the contract, to get [plaintiffs] to enter the contract." Id. "On the other hand, the breach-of-contract claim alleges that [Endurance] failed to meet its contractual obligations, after the parties entered the contract." Id. Thus, plaintiffs' fraud claims focus "on allegedly false misrepresentations that [Endurance] made before entering the contract"; their "breach-of-contract claim focuses on [Endurance]'s actual failure to perform." Id. at 854. The fraud claims are thus "sufficiently distinct from the breach-of-contract claim," id. at 855, such that "dismissal of [Endurance]'s fraud claims is not warranted under *Greenberger*," id. at 854 (denying motion to dismiss fraud claims based on alleged redundancy with breach-of-contract claim).

For these reasons, the court denies Endurance's motion to dismiss Counts III and IV.

### Count V – Negligent Misrepresentation

Endurance next argues that plaintiffs' negligent misrepresentation claim (Count V) fails under the "economic loss doctrine." Under the economic loss doctrine—"also known as the *Moorman* doctrine"—"a plaintiff cannot recover purely economic losses in tort." Five-Star AudioVisual, 769 F. Supp. 3d at 855. "Economic losses include damages for inadequate value, costs of repair and replacement of the defective product, or consequent loss of profits – without any claim of personal injury or damage to other property." Id. (cleaned up).

Endurance contends that plaintiffs allege in Count V that Endurance had a duty to pay for plaintiffs' vehicle repairs and that this duty arises solely out of the VSC obligations. Because

Endurance owed plaintiffs "no duty . . . outside of the VSCs," Endurance asserts, the negligent misrepresentation claim must be dismissed.

In response, plaintiffs argue that the "economic loss doctrine does not preclude claims where fraudulent inducement is adequately alleged."[7]   Because plaintiffs allege that Endurance's negligent misrepresentations induced plaintiffs to purchase the VSCs, plaintiffs assert that their claim falls within a recognized exception to the economic loss doctrine.

The court disagrees.   To be sure, courts recognize an exception to the economic loss doctrine when the claim "involves intentional misrepresentations."   Five-Star AudioVisual, 769 F. Supp. 3d at 855.   Indeed, "[t]hat's why the intentional fraud claims can survive."   Id.   "But a carve-out for intentional acts cannot save a negligence claim, like [plaintiffs'] negligent-misrepresentation claim."   Id.   "So the . . . exception doesn't apply."   Id.   The court thus dismisses Count V.   Id. at 858 (dismissing negligent misrepresentation claim).[8]

### Count II – Unjust Enrichment

Finally, Endurance argues that plaintiffs' unjust enrichment claim (Count II) fails because plaintiffs "concede an express contract."   Endurance argues that "unjust enrichment 'is unavailable where the conduct at issue is the subject of an express contract between the plaintiff and the defendant,'" and that "[a]llegations of an express contract that governs the parties'

---

[7] Endurance assumes that Illinois law governs this claim.   Plaintiffs do not dispute that this is so, and suggest by their cited case law that the doctrine applies equally under Illiniois, Ohio, and Michigan laws.

[8] There is also a second exception to the economic loss doctrine "where one who is in the business of supplying information for the guidance of others in their business transactions makes negligent representations."   Id.   Plaintiffs do not argue that this second exception applies.   And it clearly would not.

relationship may not be included in the unjust enrichment count." (Quoting <u>Cohen v. Am. Sec. Ins. Co.</u>, 735 F.3d 601, 615 (7th Cir. 2013)).[9] Because plaintiffs allege in the complaint that "the VSCs govern their relationship [with] Endurance," and Count II incorporates by reference these allegations, Count II must be dismissed.

Plaintiffs respond, asserting that Endurance "overlooks . . . that pleading alternative claims is permitted." (Citing Fed. R. Civ. P. 8(a)(3)). Because plaintiffs "plead the unjust enrichment claim 'in the alternative to Plaintiffs' contract-based claims,'" (quoting the complaint), plaintiffs suggest that their unjust enrichment claim survives.

Plaintiffs are wrong. As the Seventh Circuit has "long recognized": "when two parties' relationship is governed by contract, they may not bring a claim of unjust enrichment unless the claim falls outside the contract." <u>LKQ Corp. v. Rutledge</u>, 96 F.4th 977, 981 (7th Cir. 2024) (cleaned up) (applying Illinois law). As a result, when, "as here, the existence of a contract between the parties is undisputed, an unjust enrichment claim will seldom survive a motion to dismiss." <u>Id.</u>

Plaintiffs do not "suggest that [their] claim falls outside" the VSCs. <u>Id.</u> Just the opposite: they "maintain[ ] that [they] properly and sufficiently pleaded unjust enrichment as an alternative theory of recovery." <u>Id.</u> "But a party may not incorporate by reference allegations of the existence of a contract between the parties in the unjust enrichment count." <u>Id.</u> (cleaned up). Yet plaintiffs do just that in their complaint: they "incorporate by reference each of the allegations contained in the foregoing paragraphs of this Complaint" (quoting the complaint)— including the allegations of the preceding Count I breach-of-contract claim. "This pleading

---

[9] Endurance again assumes that Illinois law governs this claim. Plaintiffs do not dispute this.

error prevents any unjust enrichment claim from going forward." LKQ, 96 F.4th at 981 (affirming district court's dismissal of unjust enrichment claim). The court therefore grants Endurance's motion to dismiss Count II.

<strong><u>CONCLUSION</u></strong>

For the above reasons, the court grants in part and denies in part Endurance's motion to compel arbitration and to dismiss the class action complaint [14]. As for the motion to compel arbitration, the court grants the motion as to Rinella and stays this action as to Rinella pending the outcome of the arbitration. The court denies the motion as to Cooper, Wilder, and Rumpf.

As for the motion to dismiss based on class action waiver, the court denies the motion as to Rumpf, but grants the motion as to Rinella, Kujawa, Wilder, and Cooper. As for the motion to dismiss or strike the class action allegations, the court grants the motion and strikes the class action allegations. And as for Endurance's motion to dismiss Counts II through V, the court denies the motion as to Counts III and IV but grants it as to Count II and Count V. Counts II and V are thus dismissed.

The remaining plaintiffs are given leave to file an amended complaint consistent with the holding in this opinion on or before December 23, 2025. Endurance is directed to answer or otherwise plead to the amended complaint on or before January 20, 2026. The parties are directed to file a joint status report using this court's form on or before January 27, 2026. So ordered.

**ENTER:**

**Robert W. Gettleman**
**United States District Judge**

**DATE: 11/25/2025**